13 CIV 6727

RECEIVED

2013 SEP 23 P 8:56

U S DISTRICT COURT SDNY

RECEIVED

SEP 23 2013

U.S.D.C. S.D.N.Y.
CASHIERS

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No.<br>)<br>)  **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

# TABLE OF CONTENTS

Page

I.   NATURE OF THE ACTION ........................................................................1

       Table 1 ........................................................................................ 2

II.  PARTIES AND RELEVANT NON-PARTIES ...........................................3

III. JURISDICTION AND VENUE ..................................................................5

IV.  MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION...............6

       Figure 1 ...................................................................................... 9

V.   RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT .................9

       Table 2 ...................................................................................... 10

VI.  THE CREDIT UNIONS' PURCHASES....................................................12

       Table 3 ...................................................................................... 13

VII. THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING
     GUIDELINES STATED IN THE OFFERING DOCUMENTS ......................................14

       A.   The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and
            the High OTD Practices of the Originators Demonstrate Systematic Disregard of
            Underwriting Standards ........................................................................15

            Table 4 .............................................................................. 16

            Table 5 .............................................................................. 20

       B.   The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the
            Originators' Systematic Disregard of Underwriting Standards ...........................20

            Figure 2 ............................................................................ 23

       C.   The Collapse of the Certificates' Credit Ratings is Evidence of Systematic
            Disregard of Underwriting Guidelines....................................................28

       D.   Revelations Subsequent to the Offerings Show That the Originators
            Systematically Disregarded Underwriting Standards ...........................................28

            1.   The Systematic Disregard of Underwriting Standards Was Pervasive as
                 Revealed After the Collapse ....................................................29

            2.   Countrywide's Systematic Disregard of Underwriting Standards............33

            3.   Fremont's Systematic Disregard of Underwriting Standards ...................41

            4.   IndyMac's Systematic Disregard of Underwriting Standards ..................44

            5.   MortgageIT's Systematic Disregard of Underwriting Standards .............48

            6.   New Century's Systematic Disregard of Underwriting Standards ............51

i

7.     Wells Fargo's Systematic Disregard of Underwriting Standards .............60

E.     Loans That Did Not Comply with the Underwriting Guidelines Were Routinely
Collateral for UBS-Underwritten RMBS.................................................................63

F.     Additional Evidence Confirms That Defective Loans Were Routinely Packaged
into UBS's RMBS......................................................................................................66

VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF
MATERIAL FACT.....................................................................................................67

Table 6 ....................................................................................................... 67

A.     Untrue Statements Concerning Adherence to Underwriting Guidelines ..............68

B.     Untrue Statements Concerning Adherence to Reduced Documentation Program
Underwriting Guidelines..........................................................................................80

C.     Untrue Statements Concerning Loan-to-Value Ratios and DTI Ratios................86

IX.   THE CLAIMS ARE TIMELY.................................................................................91

X.    CLAIMS FOR RELIEF ..........................................................................................92

COUNT ONE Violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33
(BCAPB LLC Trust 2007-AB1, BCAP LLC Trust 2007-AA1, BCAP LLC Trust
2007-AA2, BCAP LLC Trust 2007-AA3, Fremont Home Loan Trust 2006-C,
Securitized Asset Backed Receivables LLC Trust 2006-HE2, Wells Fargo Home
Equity Asset-Backed Securities 2006-3 Trust, and Wells Fargo Home Equity Asset-
Backed Securities 2007-1 Trust)................................................................................ 92

COUNT TWO Violation of the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Ann.
5/12 (BCAPB LLC Trust 2007-AB1, BCAP LLC Trust 2007-AA2, BCAP LLC Trust
2007-AA3, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and
Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust) .......................... 94

4226143.1

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of Southwest Corporate Federal Credit Union ("Southwest") and Members United Corporate Federal Credit Union ("Members United") (collectively "the Credit Unions") against Barclays Capital, Inc. ("Barclays") as the underwriter and seller of certain residential mortgage-backed securities ("RMBS") purchased by the Credit Unions, and alleges as follows:

## I.      NATURE OF THE ACTION

1.      This action arises out of the sale of RMBS to the Credit Unions where Barclays acted as underwriters and/or sellers of the RMBS.

2.      All of the RMBS sold to the Credit Unions were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.      Barclays underwrote and sold the RMBS pursuant to registration statements, prospectuses, prospectus supplements, term sheets, free writing prospectuses, and other written materials (collectively, the "Offering Documents").  These Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 ("Texas Blue Sky Law"), and the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Ann. 5/12 & 13 ("Illinois Blue Sky Law").

4.      The Offering Documents described, among other things, the mortgage underwriting standards of the originators who made the mortgages that were pooled and served as the collateral for the RMBS purchased by the Credit Unions ("the Originators").

5.      The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

4226143.1

6.      In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented.

7.      These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

8.      The Credit Unions purchased certain RMBS underwritten and/or sold by Barclays as indicated in Table 1 (*infra*).  Barclays is therefore liable for material untrue statements and omissions of fact in the Offering Documents for these RMBS under the Texas Blue Sky Law and Illinois Blue Sky Law as indicated in Table 1 (*infra*).

**Table 1**

| CUSIP[1] | Issuing Entity | Purchaser | Trade Date | Price Paid | Claims |
|---|---|---|---|---|---|
| 05529DAA0 | BCAPB LLC Trust 2007-AB1 | Southwest | 7/18/2007 | $24,986,483 | Texas Blue Sky |
| 05529DAA0 | BCAPB LLC Trust 2007-AB1 | Members United | 7/18/2007 | $29,983,779 | Illinois Blue Sky |
| 05530PAP7 | BCAP LLC Trust 2007-AA1 | Southwest | 2/23/2007 | $15,000,000 | Texas Blue Sky |
| 05530NAA5 | BCAP LLC Trust 2007-AA2 | Southwest | 3/27/2007 | $10,000,000 | Texas Blue Sky |
| 05530NAA5 | BCAP LLC Trust 2007-AA2 | Members United | 3/27/2007 | $30,000,000 | Illinois Blue Sky |
| 05530VAB5 | BCAP LLC Trust 2007-AA3 | Members United | 5/18/2007 | $21,173,000 | Illinois Blue Sky |
| 05530VAN9 | BCAP LLC Trust 2007-AA3 | Southwest | 5/24/2007 | $12,000,000 | Texas Blue Sky |
| 05530VAP4 | BCAP LLC Trust 2007-AA3 | Members United | 5/24/2007 | $25,000,000 | Illinois Blue Sky |
| 35729TAD4 | Fremont Home Loan Trust 2006-C | Southwest | 8/25/2006 | $10,000,000 | Texas Blue Sky |

------

[1]      "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."  A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

4226143.1

| CUSIP[1] | Issuing Entity | Purchaser | Trade Date | Price Paid | Claims |
|---|---|---|---|---|---|
| 81377AAD4 | Securitized Asset Backed Receivables LLC Trust 2006-HE2 | Southwest | 9/15/2006 | $ 10,000,000 | Texas Blue Sky |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust | Southwest | 5/31/2007 | $15,008,665 | Texas Blue Sky |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust | Members United | 12/6/2006 | $20,000,000 | Illinois Blue Sky |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust | Southwest | 12/5/2006 | $20,000,000 | Texas Blue Sky |
| 9497EVAB1 | Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust | Members United | 3/20/2007 | $30,000,000 | Illinois Blue Sky |
| 9497EVAB1 | Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust | Southwest | 3/26/2007 | $20,000,000 | Texas Blue Sky |

9.     The RMBS the Credit Unions purchased suffered a significant drop in market value.  The Credit Unions have suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.     PARTIES AND RELEVANT NON-PARTIES

10.     The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021 through

4226143.1

assessments against all federally insured credit unions in the country. The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions. The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF. The NCUA is under the management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

11.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas. As a corporate credit union, Southwest provided investment and financial services to other credit unions.

12.     Members United was a federally chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois. Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions. As a corporate credit union, Members United provided investment and financial services to other credit unions.

13.     On September 24, 2010, the NCUA Board placed the Credit Unions into conservatorship pursuant to the FCUA, 12 U.S.C. § 1751, *et seq*. On October 31, 2010, the NCUA Board placed the Credit Unions into involuntary liquidation, appointing itself Liquidating Agent.

14.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the Credit Unions and of any member, account holder, officer or director of the Credit Unions, with respect to the Credit Unions and their assets, including the right to bring the claims asserted in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the Credit Unions, and succeeds to all rights, titles, powers, and privileges of the

Credit Unions. *See* 12 U.S.C. §1787(b)(2)(A). The NCUA Board may also sue on the Credit

Unions' behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

15. Prior to being placed into conservatorship and involuntary liquidation, the Credit

Unions were two of the largest corporate credit unions in the United States.

16. Any recoveries from this legal action will reduce the total losses resulting from

the failure of the Credit Unions. Losses from the Credit Unions' failures must be paid from the

NCUSIF or the TCCUSF. Expenditures from these funds must be repaid through assessments

against all federally insured credit unions. Because of the expenditures resulting from the Credit

Unions' failures, federally insured credit unions will experience larger assessments, thereby

reducing federally insured credit unions' net worth. Reductions in net worth can adversely affect

the dividends that individual members of credit unions receive for the savings on deposit at their

credit union. Reductions in net worth can also make loans for home mortgages and automobile

purchases more expensive and difficult to obtain. Any recoveries from this action will help to

reduce the amount of any future assessments on credit unions throughout the system, reducing

the negative impact on federally insured credit unions' net worth. Recoveries from this action

will benefit credit unions and their individual members by increasing net worth resulting in more

efficient and lower-cost lending practices.

17. Barclays is a United States Securities and Exchange Commission ("SEC")

registered broker-dealer. Barclays acted as an underwriter and seller of certain RMBS that are

the subject of this Complaint as indicated in Table 1 (*supra*). Barclays is a Connecticut

corporation with its principal place of business in New York.

## III.    JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to: (a) 12 U.S.C. § 1789(a)(2),

which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA

- 5 -

Board] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

19.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a) and/or 28 U.S.C. §1391(b)(1), because Barclays is a resident of/conducts business in this District.  This Court has personal jurisdiction over Barclays because it is a resident of/conducts business in this District.

## IV.    MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION

20.     RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

21.     Because residential mortgages are the assets collateralizing RMBS, the origination of mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics, including: the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the loan-to-value ("LTV") ratio, among other things.  Loan underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

22.     Historically, originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

23.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively government sponsored enterprises or "GSEs") began purchasing "conforming" or "prime" loans —so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance (Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac).  The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments.  The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

24.     More recently, originators, usually working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private underwriting guidelines adopted by the originators.  Non-conforming loans are also known as "nonprime loans" or "private label" and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

25.     All of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

- 7 -

26.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006. The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

27.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

28.     The depositor transfers the loans to a trust called the "issuing entity."

29.     The issuing entity issues "notes" and/or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

30.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

31.     One or more "underwriters" then sell the notes or certificates to investors.

32.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

33.     Figure 1 (*infra*) depicts a typical securitization process.

4226143.1

**Figure 1**
*Illustration of the Securitization Process*



34.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

35.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

36.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

37.     The credit rating agencies use letter-grade rating systems as shown in Table 2 (*infra*).

**Table 2**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | Prime (Maximum Safety) | |
| Aa1 Aa2 Aa3 | AA+ AA AA- | High Grade, High Quality | INVESTMENT GRADE |
| A1 A2 A3 | A+ A A- | Upper Medium Grade | |
| Baa1 Baa2 Baa3 | BBB+ BBB BBB- | Medium Grade | |
| Ba2 Ba3 | BB BB- | Non-Investment Grade, or Speculative | |
| B1 B2 B3 | B+ B B- | Highly Speculative, or Substantial Risk | |
| Caa2 Caa3 | CCC+ | In Poor Standing | SPECULATIVE GRADE |
| Ca | CCC CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

38.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf.  Likewise, S&P rates a product

4226143.1

"AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Standard & Poor's, Ratings Definitions, *available at* https://www.globalcreditportal.com/ratingsdirect/renderArticle.do?articleId=1019442&SctArtId =147045&from=CM&nsl_code=LIME.

39.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as the Credit Unions, which are generally limited to buying only securities with the highest credit ratings.  *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see*, *e.g.*, Alternatives to the Use of Credit Ratings, 77 Fed. Reg. 74,103 (Dec. 13, 2012) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742).

40.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A credit rating on the higher tranches of RMBS.

41.     One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments.  After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

42.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinated tranches first.

43.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

44.     Another form of credit enhancement is overcollateralization.  Overcollateraliza-tion is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

45.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a loan group in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.     THE CREDIT UNIONS' PURCHASES

46.     The Credit Unions purchased only the highest-rated tranches of RMBS.  All were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 3).

- 12 -

**Table 3**
*Credit Ratings for the Credit Unions' RMBS Purchases*

| CUSIP | Issuing Entity | Buyer | Original Rating S&P | Original Rating Moody's | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade Moody's | Recent Rating S&P | Recent Rating Moody's |
|---|---|---|---|---|---|---|---|---|
| 05529DAA0 | BCAPB LLC Trust 2007-AB1 | Southwest/ Members United | AAA 7/26/2007 | Aaa 8/7/07 | CCC 10/22/09 | Caa1 1/29/09 | CCC 10/22/09 | Caa3 11/11/10 |
| 05530PAP7 | BCAP LLC Trust 2007-AA1 | Southwest | AAA 3/2/2007 | Aaa 3/13/07 | B+ 3/19/09 | Caa2 1/29/09 | D 9/25/12 | Caa3 11/11/10 |
| 05530NAA5 | BCAP LLC Trust 2007-AA2 | Southwest/ Members United | AAA 4/3/2007 | Aaa 3/29/07 | CCC 7/24/09 | Caa3 1/29/09 | D 9/25/12 | Ca 11/11/10 |
| 05530VAB5 | BCAP LLC Trust 2007-AA3 | Members United | AAA 6/4/2007 | Aaa 6/14/07 | B- 2/16/10 | B3 1/29/09 | CCC 8/11/11 | Caa2 11/11/10 |
| 05530VAN9 | BCAP LLC Trust 2007-AA3 | Southwest | AAA 6/4/2007 | Aaa 6/14/07 | CCC 6/25/09 | Caa1 1/29/09 | CCC 6/25/09 | Caa3 11/11/10 |
| 05530VAP4 | BCAP LLC Trust 2007-AA3 | Members United | AAA 6/4/2007 | Aaa 6/14/07 | CCC 6/25/09 | Caa1 1/29/09 | CCC 6/25/09 | Caa3 11/11/10 |
| 35729TAD4 | Fremont Home Loan Trust 2006-C | Southwest | AAA 9/11/2006 | Aaa 9/19/06 | CCC 8/4/09 | Caa2 3/17/09 | CCC 8/4/09 | Ca 4/29/10 |
| 81377AAD4 | Securitized Asset Backed Receivables LLC Trust 2006-HE2 | Southwest | AAA 9/29/2006 | Aaa 9/28/06 | CCC 8/4/09 | Ba2 11/21/08 | CCC 8/4/09 | Ca 7/8/10 |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust | Southwest/ Members United | AAA 12/28/2006 | Aaa 12/21/06 | B- 8/4/09 | Ba1 3/23/09 | B- 11/1612 | Caa2 6/3/10 |
| 9497EVAB1 | Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust | Southwest/ Members United | NR | Aaa 3/30/07 | NR | Ba1 10/16/08 | NR | Caa3 6/3/10 |

47.    At the time of purchase, the Credit Unions were not aware of the untrue

statements or omissions of material facts in the Offering Documents of the RMBS.   If the Credit

4226143.1

Unions had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—they would not have purchased the certificates.

48.     The securities' substantial loss of market value has injured the Credit Unions and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

49.     The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on the underlying mortgage loans.

50.     With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

- a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 4);

- actual gross losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected gross losses (*see infra* Section VII.B and Figure 2);

- a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 5 and accompanying allegations); and

- downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and *supra* Table 3).

51.     These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

52.     This conclusion is corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

53.     This conclusion is further corroborated by evidence from Barclays's due diligence process that RMBS underwritten by Barclays were collateralized by a substantial number of loans that were originated contrary to the applicable underwriting standards (*see infra* Section VII.E-F).

A.      **The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

54.     Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

55.     The surge of delinquencies and defaults following the Offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 4).

56.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the Offerings (*see infra* Table 4).

57.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 9.49% within the first three months, up to 15.37% at six months, and up to 30.26% at one year (*see infra* Table 4).

58.     As of June 2013, 37.43% of the mortgage collateral across all the RMBS that the Credit Unions purchased was in delinquency, bankruptcy, foreclosure, or real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 4).

- 15 -

59.     Table 4 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last five columns are from the trustee reports (dates and page references are indicated in the parentheticals).  The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by the Credit Unions; however, some trustee reports include only the aggregate data.  For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 4**
***Delinquency and Default Rates for the Credit Unions' RMBS Purchases***

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 05529DAA0 | BCAPB LLC Trust 2007-AB1 (P.S. dated July 18, 2007) | 0.92% of the mortgage loans will be 30 or more days delinquent (S-33) | 2.13% (July, p.10) | 4.94% (Sep., p.10) | 9.73% (Dec., p.10) | 21.43% (June, p.10) | 39% (June 2013, p.10) |
| | BCAP LLC Trust 2007-AA1: Aggregate (P.S. dated Feb. 26, 2007) | Zero. (S-40) | 2.70% (Mar., p.13) | 3.60% (May, p.13) | 5.47% (Aug., p.13) | 13.50% (Feb., p.13) | 33.36% (June 2013, p.13) |
| | BCAP LLC Trust 2007-AA1: Group 1 | Zero. (S-40) | 2.75% (Mar., p.14) | 4.50 % (May, p.14) | 5.85% (Aug., p.14) | 14.04% (Feb., p.15) | 39.92% (June 2013, p.18) |
| 05530PAP7 | BCAP LLC Trust 2007-AA1: Group 2 *Class II-A-1 in Group 2 (S-7) | Zero. (S-40) | 2.65% (Mar., p.15) | 2.46 % (May, p.15) | 4.99% (Aug., p.15) | 12.85% (Feb., p.17) | 26.03% (June 2013, p.24) |
| | BCAP LLC Trust 2007-AA2: Aggregate (P.S. dated Mar., 28, 2007) | Zero. (S-52) | 2.14% (Apr., p.14) | 3.55% (June, p.14) | 5.46% (Sep., p.14) | 13.75% (Mar., p.14) | 33.21% (June 2013, p.14) |

4226143.1

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 05530NAA5 | BCAP LLC Trust 2007-AA2: Group 1 *Class I-2-A-1 in Group 1 (S-3) | Zero. (S-52) | 2.36% (Apr., p.16) | 4.83% (June, p.16) | 7.27% (Sep., p.16) | 16.46% (Mar., p.16) | 36.38% (June 2013, p.19) |
| | BCAP LLC Trust 2007-AA2: Group 2 | Zero. (S-52) | 1.57% (Apr., p.18) | 0.1% (June, p.18) | 0.62% (Sep., p.18) | 6.45% (Mar., p.18) | 24.96% (June 2013, p.25) |
| | BCAP LLC Trust 2007-AA3: Aggregate (P.S. dated May 30, 2007) | Zero. (S-44) | 2.08% (June, p.14) | 3.16% (Aug., p.14) | 6.28% (Nov., p.14) | 14.08% (May, p.14) | 32.12% (June 2013, p.14) |
| 05530VAB5 | BCAP LLC Trust 2007-AA3: Group 1 *Class I-A-1B in Group 1 (S-4) | Zero. (S-44) | 0.76% (June, p.15) | 1.73% (Aug., p.15) | 3.63% (Nov., p.15) | 8.93% (May, p.16) | 22.01% (June 2013, p.19) |
| 05530VAN9 05530VAP4 | BCAP LLC Trust 2007-AA3: Group 2 *Classes II-A-1A and II-A-1B in Group 2 (S-4) | Zero. (S-44) | 3.26% (June, p.16) | 4.46% (Aug., p.16) | 8.68% (Nov., p.16) | 18.82% (May, p.18) | 41.05% (June 2013, p.25) |
| | Fremont Home Loan Trust 2006-C: Aggregate (P.S. dated July 11, 2006) | Zero. (S-19) | 1.71% (Oct., p.10) | 6.39% (Dec., p.10) | 13.49% (Mar., p.10) | 26.27% (Sep., p.10) | 41.92% (June 2013, p.9) |
| | Fremont Home Loan Trust 2006-C: Group 1 | Zero. (S-19) | 0.14% (Oct., p.11) | 1.34% (Dec., p.11) | 2.42% (Mar., p.11) | 10.96% (Sep., p.11) | 29.46% (June 2013, p.10) |
| 35729TAD4 | Fremont Home Loan Trust 2006-C: Group 2 *Class 2-A2 in Group 2 (S-9) | Zero. (S-19) | 1.37% (Oct., p.11) | 4.92% (Dec., p.11) | 11.02% (Mar., p.11) | 25.41% (Sep., p.11) | 45.03% (June 2013, p.10) |

- 17 -

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Fremont Home Loan Trust 2006-C: Group 3 | Zero. (S-19) | 0.6% (Oct., p.12) | 4.07% (Dec., p.12) | 8.03% (Mar., p.12) | 17.02% (Sep., p.12) | 27.26% (June 2013, p.11) |
| | Fremont Home Loan Trust 2006-C: Group 4 | Zero. (S-19) | 2.6% (Oct., p.12) | 9.2% (Dec., p.12) | 19.26% (Mar., p.12) | 33.23% (Sep., p.12) | 49.2% (June 2013, p.11) |
| 81377AAD4 | Securitized Asset Backed Receivables LLC Trust 2006-HE2: Aggregate (P.S. dated Sep. 26, 2006) | 0.21% of the mortgage loans were 30 to 59 days delinquent (S-37) | 2.28% (Oct., p.10) | 6.91% (Dec., p.9) | 12.20% (Mar., p.9) | 23.46% (Sep., p.9) | 33.83% (June 2013, p.9) |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust: Aggregate (P.S. dated Dec. 18, 2006) | Zero. (S-56) | 5.13% (Jan., p.10) | 9.49% (Mar., p.9) | 14.44% (June, p.9) | 28.37% (Dec., p.9) | 47.51% (June 2013, p.9) |
| 9497EVAB1 | Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust: Aggregate (P.S. dated Mar. 28, 2007) | Zero. (S-54) | 2.71% (Apr., p.9) | 8.42% (June, p.9) | 15.37% (Sep., p.9) | 30.26% (Mar., p.9) | 46.05% (June 2013, p.9) |

60.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by the Credit Unions, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

61.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default." Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from the

4226143.1

systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

62.    In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id*. at 2.

63.    The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.  The FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk. By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower. As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering underwriting standards in ways that investors may have difficulty detecting.  The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id*. at 3.

4226143.1

64.    Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

65.    High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of default.  Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

66.    Table 5 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages.   The data was obtained from the Home Mortgage Disclosure Act database.

**Table 5**
*Originator "Originate-to-Distribute" Percentages*

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| Aegis Mortgage Corp. | 100 | 100 | |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| Fremont Investment & Loan | 91.2 | 85.2 | 94 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| MortgageIT, Inc. | 55.1 | 98.8 | 100 |
| New Century Mortgage Corporation | 92.4 | 84.2 | |
| Wells Fargo Bank, N.A. | 73.5 | 67.1 | 61.6 |

**B.    The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

67.    The actual defaults in the mortgage pools underlying the RMBS the Credit Unions purchased exceeded expected defaults so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

- 20 -

68.     Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

69.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss. The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

70.     "Actual loss" is the economic loss the mortgage pool experiences *in fact*.  So "actual gross loss" is the *actual* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the *actual* cumulative realized loss on defaulted loans after foreclosure.

71.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities.  So "expected gross loss" is the *expected* cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the *expected* cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

72.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  CE/ENL = RF).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A "triple-A" rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times

- 21 -

the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

73.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

74.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss ($EGL = ENL/(1 - ERR)$).

75.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) the pools backing the RMBS purchased by the Credit Unions experienced in the first twelve months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

76.    The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

77.    As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual balance of defaulted loans in the first twelve months following issuance far exceeded the expected balance of defaulted loans based on historical performance.

**Figure 2**
***Illustration of Expected Gross Losses v. Actual Gross Losses for***
***The Credit Unions' RMBS Purchases***

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| BCAP LLC Trust 2007-AB1 | 43197 | 1 | $ - | $ 362,678 |
| BCAP LLC Trust 2007-AB1 | 43197 | 2 | $ 3,949,480 | $ 396,135 |
| BCAP LLC Trust 2007-AB1 | 43197 | 3 | $ 8,519,593 | $ 432,609 |
| BCAP LLC Trust 2007-AB1 | 43197 | 4 | $ 11,679,056 | $ 472,357 |
| BCAP LLC Trust 2007-AB1 | 43197 | 5 | $ 19,104,640 | $ 515,658 |
| BCAP LLC Trust 2007-AB1 | 43197 | 6 | $ 24,148,511 | $ 562,810 |
| BCAP LLC Trust 2007-AB1 | 43197 | 7 | $ 3,598,731 | $ 614,133 |
| BCAP LLC Trust 2007-AB1 | 43197 | 8 | $ 41,268,808 | $ 669,970 |
| BCAP LLC Trust 2007-AB1 | 43197 | 9 | $ 50,912,345 | $ 730,686 |
| BCAP LLC Trust 2007-AB1 | 43197 | 10 | $ 55,230,879 | $ 796,670 |
| BCAP LLC Trust 2007-AB1 | 43197 | 11 | $ 64,089,145 | $ 868,336 |
| BCAP LLC Trust 2007-AB1 | 43197 | 12 | $ 70,341,296 | $ 946,120 |



4226143.1

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| BCAP LLC Trust 2007-AA1 | 40920 | 1 | $ - | $ 1,917,143 |
| BCAP LLC Trust 2007-AA1 | 40920 | 2 | $ - | $ 2,094,000 |
| BCAP LLC Trust 2007-AA1 | 40920 | 3 | $ - | $ 2,286,800 |
| BCAP LLC Trust 2007-AA1 | 40920 | 4 | $ 5,283,437 | $ 2,496,911 |
| BCAP LLC Trust 2007-AA1 | 40920 | 5 | $ 12,456,212 | $ 2,725,802 |
| BCAP LLC Trust 2007-AA1 | 40920 | 6 | $ 18,921,827 | $ 2,975,050 |
| BCAP LLC Trust 2007-AA1 | 40920 | 7 | $ 20,569,097 | $ 3,246,349 |
| BCAP LLC Trust 2007-AA1 | 40920 | 8 | $ 23,148,525 | $ 3,541,507 |
| BCAP LLC Trust 2007-AA1 | 40920 | 9 | $ 22,072,675 | $ 3,862,456 |
| BCAP LLC Trust 2007-AA1 | 40920 | 10 | $ 36,299,348 | $ 4,211,253 |
| BCAP LLC Trust 2007-AA1 | 40920 | 11 | $ 40,018,106 | $ 4,590,083 |
| BCAP LLC Trust 2007-AA1 | 40920 | 12 | $ 49,300,426 | $ 5,001,256 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| BCAP LLC Trust 2007-AA2 | 40931 | 1 | $ 11,238,289 | $ 386,461 |
| BCAP LLC Trust 2007-AA2 | 40931 | 2 | $ - | $ 422,112 |
| BCAP LLC Trust 2007-AA2 | 40931 | 3 | $ 316,200 | $ 460,977 |
| BCAP LLC Trust 2007-AA2 | 40931 | 4 | $ 6,906,381 | $ 503,331 |
| BCAP LLC Trust 2007-AA2 | 40931 | 5 | $ 13,623,118 | $ 549,471 |
| BCAP LLC Trust 2007-AA2 | 40931 | 6 | $ 18,422,319 | $ 599,715 |
| BCAP LLC Trust 2007-AA2 | 40931 | 7 | $ 20,354,859 | $ 654,404 |
| BCAP LLC Trust 2007-AA2 | 40931 | 8 | $ 31,250,499 | $ 713,902 |
| BCAP LLC Trust 2007-AA2 | 40931 | 9 | $ 43,614,892 | $ 778,600 |
| BCAP LLC Trust 2007-AA2 | 40931 | 10 | $ 48,205,948 | $ 848,911 |
| BCAP LLC Trust 2007-AA2 | 40931 | 11 | $ 53,123,226 | $ 925,276 |
| BCAP LLC Trust 2007-AA2 | 40931 | 12 | $ 66,101,752 | $ 1,008,161 |



4226143.1

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| BCAP LLC Trust 2007-AA3 | 41451 | 1 | $ 213,858 | $ 435,676 |
| BCAP LLC Trust 2007-AA3 | 41451 | 2 | $ 213,822 | $ 475,867 |
| BCAP LLC Trust 2007-AA3 | 41451 | 3 | $ 777,822 | $ 519,682 |
| BCAP LLC Trust 2007-AA3 | 41451 | 4 | $ 8,608,377 | $ 567,430 |
| BCAP LLC Trust 2007-AA3 | 41451 | 5 | $ 14,572,813 | $ 619,446 |
| BCAP LLC Trust 2007-AA3 | 41451 | 6 | $ 17,172,414 | $ 676,088 |
| BCAP LLC Trust 2007-AA3 | 41451 | 7 | $ 24,888,282 | $ 737,742 |
| BCAP LLC Trust 2007-AA3 | 41451 | 8 | $ 33,080,681 | $ 804,817 |
| BCAP LLC Trust 2007-AA3 | 41451 | 9 | $ 43,577,396 | $ 877,754 |
| BCAP LLC Trust 2007-AA3 | 41451 | 10 | $ 48,596,726 | $ 957,019 |
| BCAP LLC Trust 2007-AA3 | 41451 | 11 | $ 57,901,077 | $ 1,043,109 |
| BCAP LLC Trust 2007-AA3 | 41451 | 12 | $ 71,758,345 | $ 1,136,549 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Fremont Home Loan Trust 2006-C | 39204 | 1 | $ 1,569,184 | $ 9,517,854 |
| Fremont Home Loan Trust 2006-C | 39204 | 2 | $ 4,865,617 | $ 10,395,877 |
| Fremont Home Loan Trust 2006-C | 39204 | 3 | $ 24,078,641 | $ 11,353,056 |
| Fremont Home Loan Trust 2006-C | 39204 | 4 | $ 42,389,502 | $ 12,396,173 |
| Fremont Home Loan Trust 2006-C | 39204 | 5 | $ 79,316,088 | $ 13,532,524 |
| Fremont Home Loan Trust 2006-C | 39204 | 6 | $ 106,507,301 | $ 14,769,945 |
| Fremont Home Loan Trust 2006-C | 39204 | 7 | $ 114,686,777 | $ 16,116,834 |
| Fremont Home Loan Trust 2006-C | 39204 | 8 | $ 134,549,722 | $ 17,582,176 |
| Fremont Home Loan Trust 2006-C | 39204 | 9 | $ 142,679,155 | $ 19,175,562 |
| Fremont Home Loan Trust 2006-C | 39204 | 10 | $ 146,678,383 | $ 20,907,202 |
| Fremont Home Loan Trust 2006-C | 39204 | 11 | $ 137,101,518 | $ 22,787,939 |
| Fremont Home Loan Trust 2006-C | 39204 | 12 | $ 137,121,091 | $ 24,829,251 |



4226143.1

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 1 | $ - | $ 906,585 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 2 | $ 665,773 | $ 990,217 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 3 | $ 10,831,557 | $ 1,081,389 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 4 | $ 24,037,945 | $ 1,180,747 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 5 | $ 34,676,773 | $ 1,288,986 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 6 | $ 38,609,711 | $ 1,406,851 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 7 | $ 54,857,087 | $ 1,535,144 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 8 | $ 61,410,941 | $ 1,674,719 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 9 | $ 67,915,017 | $ 1,826,490 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 10 | $ 85,584,565 | $ 1,991,431 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 11 | $ 91,644,408 | $ 2,170,573 |
| Securitized Asset Backed Receivables LLC Trust 2006-HE2 | 39070 | 12 | $ 98,717,757 | $ 2,365,010 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 1 | $ - | $ 963,865 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 2 | $ 155,008 | $ 1,052,782 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 3 | $ 561,215 | $ 1,149,715 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 4 | $ 16,112,718 | $ 1,255,350 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 5 | $ 27,583,513 | $ 1,370,428 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 6 | $ 43,478,362 | $ 1,495,740 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 7 | $ 44,845,806 | $ 1,632,139 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 8 | $ 54,066,887 | $ 1,780,533 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 9 | $ 60,469,116 | $ 1,941,894 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 10 | $ 71,167,062 | $ 2,117,255 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 11 | $ 82,532,652 | $ 2,307,716 |
| Wells Fargo Home Equity Asset Backed Securities 2006-3 Trust | 40034 | 12 | $ 91,627,355 | $ 2,514,438 |



4226143.1

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 1 | $ 26,787 | $ 430,512 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 2 | $ 26,780 | $ 470,227 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 3 | $ 5,141,611 | $ 513,522 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 4 | $ 5,073,469 | $ 560,705 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 5 | $ 9,418,254 | $ 612,104 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 6 | $ 18,136,059 | $ 668,075 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 7 | $ 25,070,217 | $ 728,998 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 8 | $ 31,067,793 | $ 795,278 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 9 | $ 37,481,775 | $ 867,350 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 10 | $ 48,260,432 | $ 945,676 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 11 | $ 50,398,825 | $ 1,030,746 |
| Wells Fargo Home Equity Trust 2007-1 | 41171 | 12 | $ 60,342,168 | $ 1,123,078 |



78.     As clearly shown in Figure 2 (*supra*), actual gross losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the Fremont Home Loan Trust 2006-C offering, actual gross losses at month 12 exceeded $137 million, or more than 5 times the expected gross losses of approximately $25 million.  (*See supra* Figure 2).

79.     This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

80.     Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement has failed (*i.e.*, actual losses swiftly surged

- 27 -

past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

### C. The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines

81.     All of the RMBS certificates the Credit Unions purchased were rated triple-A at issuance.

82.     Moody's and S&P have since downgraded the RMBS certificates the Credit Unions purchased to well below investment grade (*see supra* Table 3).

83.     Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations. A historical example of such a scenario is the Great Depression in the U.S." *Understanding Standard & Poor's Rating Definitions*, June 3, 2009, at 14.  The certificate purchased in the BCAP LLC Trust 2007-AA1 offering (CUSIP 05530PAP7) has defaulted meaning the certificate has failed to pay out to RMBS investors as promised, because the income stream generated from the borrower's mortgage loan payments was insufficient and credit enhancement failed to make up for the shortfall.

84.     A rating downgrade is material.  The total collapse in the credit ratings of the RMBS certificates the Credit Unions purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these RMBS were impaired from the outset.

### D. Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards

85.     Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

### 1. The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse

86.     Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

87.     The Office of the Comptroller of the Currency (the "OCC"), an office within the Treasury Department, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report").  In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance.  The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

88.     Government reports and investigations and newspaper reports have uncovered the extent of pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.  Using Washington Mutual Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.  The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.  These lenders were not

the victims of the financial crisis; the high risk loans they issued became the fuel
that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE

FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011).

89.     Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report

in January 2011 that detailed, among other things, the collapse of mortgage underwriting

standards and subsequent collapse of the mortgage market and wider economy.  *See* FIN. CRISIS

INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE

FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

90.     The FCIC Report concluded that there was a "systemic breakdown in

accountability and ethics."  "Unfortunately—as has been the case in past speculative booms and

busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the

financial crisis."  *Id*. at xxii.   The FCIC found:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and
> available credit, scant regulation, and toxic mortgages—that was the spark that
> ignited a string of events, which led to a full-blown crises in the fall of 2008.
> Trillions of dollars in risky mortgages had become embedded throughout the
> financial system, as mortgage-related securities were packaged, repackaged, and
> sold to investors around the world.

*Id*. at xvi.

91.     During the housing boom, mortgage lenders focused on quantity rather than

quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The

FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within

just a matter of months after taking a loan nearly doubled from the summer of 2006 to late

2007."  *Id*. at xxii.  Early Payment Default is a significant indicator of pervasive disregard for

4226143.1

underwriting standards.  The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards…." *Id.*

92.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

93.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

94.     In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

95.     Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented

and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

96.     Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

97.     Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the OTD model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully.  Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold.  By lower underwriting standards, securitization may

- 32 -

have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

FSOC Risk Retention Report at 11 (footnote omitted).

98.    The FSOC reported that as the OTD model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans… ." *Id*.

99.    In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

100.    As discussed below, facts have recently come to light that show many of the Originators who contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.    Countrywide's Systematic Disregard of Underwriting Standards

101.    Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint.

102.    In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide,

focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

103.    On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, A Little Pity, Please, for Lenders, N.Y. Times, May 9, 2008, at C1.

104.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.
>
> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."
>
> He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."
>
> But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.
>
> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."
>
> …

- 34 -

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated.  "I don't buy the rogue.  I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray.  He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path.  It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *'If You Had a Pulse, We Gave You a Loan,'* NBC Dateline (Mar. 22, 2009)

http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-the_hansen_files_with_chris_hansen.

105.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.

*See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW

(C.D. Cal. filed June 4, 2009).  Mozilo and the other executives settled the charges with the SEC

for $73 million on October 15, 2010.  *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo,*

*Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

106.    Internal Countrywide e-mails the SEC released in connection with its lawsuit

show the extent to which Countrywide systematically deviated from its underwriting guidelines.

For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives,

Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT).  Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."  *Id.* (internal quotation marks omitted).

107.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market.  With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

108.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

109.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former

Executive Managing Director and Chief of Mortgage Banking and Capital Markets at

Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic]  It's
> not only subordinated to the first, but the first is subprime.  In addition, the
> [FICOs] are below 600, below 500 and some below 400 . . . .  With real estate
> values coming down . . . the product will become increasingly worse.  There has
> [sic] to be major changes in this program, including substantial increases in the
> minimum [FICO].

*Id.*

110.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-

year adjustable rate mortgage that allowed the borrower to choose between various monthly

payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that

most of Countrywide's Pay Option ARMs were based on stated income and admitted that

"[t]here is also some evidence that the information that the borrower is providing us relative to

their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos

Garcia, former CFO of Countrywide Financial and Jim Furash, former President of Countrywide

Bank (June 1, 2006 10:38 PM PST).

111.    An internal quality control report e-mailed on June 2, 2006, showed that for stated

income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the

loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim

Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

112.    Countrywide, apparently, was "flying blind" on how one of its popular loan

products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any

reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail

from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15

AM PDT).  Yet such loans were securitized and passed on to unsuspecting investors such as the

Credit Unions.

113.    With growing concern over the performance of Pay Option ARM loans in the

waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated

for the Bank."  E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing

Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In other words, if Countrywide was to

continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's

concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite

[Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound

unless they are full doc, no more than 75% LTV and no piggys."  *Id.*

114.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the

corrective processes that will be put into effect to permanently avoid the errors of both

judgement [sic] and protocol that have led to the issues that we face today" and that "the people

responsible for the origination process understand the necessity for adhering to the guidelines for

100% LTV sub-prime product.  This is the most dangerous product in existence and there can be

nothing more toxic and therefore requires that no deviation from guidelines be permitted

irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide

Managing Directors (Mar. 27, 2006 8:53 PM PST).

115.    Yet Countrywide routinely found exceptions to its underwriting guidelines

without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a

Countrywide managing director, explained that the "spirit" of Countrywide's exception policy

was not being followed.  He noted a "significant concentration of similar exceptions" that

"denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."

E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing

Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued: "The continued

concentration in these same categories indicates either a) inadequate controls in place to mange

[sic] rogue production units or b) general disregard for corporate program policies and

guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-

wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely
> interpreted at [Specialty Lending Group] than at the other divisions.  I understand
> that [Correspondent Lending Division] has decided to proceed with a similar
> strategy to appease their complaint customers. . . .  [Specialty Lending Group] has
> clearly made a market in this unauthorized product by employing a strategy that
> Blackwell has suggested is prevalent in the industry. . . .

*Id.*

116.    Internal reports months after an initial push to rein in the excessive use of

exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing

Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

117.    In February 2007, nearly a year after pressing for a reduction in the overuse of

exceptions and as Countrywide claimed to be tightening lending standards, Countrywide

executives found that exceptions continued to be used at an unacceptably high rate.  Frank

Aguilera stated that any "[g]uideline tightening should be considered purely optics with little

change in overall execution unless these exceptions can be contained."  E-mail from Frank

Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide,

among others (Feb. 21, 2007 4:58 PM PST).

118.    John McMurray, a former Countrywide managing director, expressed his opinion

in a September 2007 e-mail that "the exception process has never worked properly."  E-mail

4226143.1

from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

119.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

120.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

121.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

122.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there [i.e., how the employee closes the deal] . . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the practices were not the work of a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done at any cost."  *Id.*

123.    Zachary also told of a pattern of:  1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was

truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into

riskier mortgages requiring little or no documentation, knowing they could not afford it; and

3) employees coaching borrowers to overstate their income in order to qualify for loans.

124.    NBC News interviewed six other former Countrywide employees from different

parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and

practices.  Some said that Countrywide employees falsified documents intended to verify

borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen

supervisors stand over employees' shoulders and watch them . . . change incomes and things like

that to make the loan work.'"  July 1, 2008 NBC Nightly News.

125.    Not surprisingly, Countrywide's default rates reflected its approach to

underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top

ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in

Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami,

Florida.  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report,

Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas,

Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida,

Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California

and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in

Bakersfield, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3.    Fremont's Systematic Disregard of Underwriting Standards

126.    Senator Carl Levin, at a hearing before the Senate PSI, singled out Fremont as a

lender "'known for poor quality loans.'"  Opening Statement of Sen. Carl Levin, Chairman,

Permanent S. Comm. on Investigations, Hearing on *Wall Street and the Financial Crisis:  The*

4226143.1

*Role of Credit Rating Agencies* (Apr. 23, 2010).  Senator Levin recounted how an analyst with

S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS

offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman
> Sachs using subprime loans from Fremont Investment and Loan, *a subprime*
> *lender known for loans with high rates of delinquency*.  On January 24, 2007, an
> analyst wrote seeking advice from two senior analysts:  "I have a Goldman deal
> with subprime Fremont collateral.  *Since Fremont collateral has been performing*
> *not so good, is there anything special I should be aware of*?"  One analyst
> responded:  "*No, we don't treat their collateral any differently.*"  The other asked:
> "are the FICO scores current?"  "Yup," came the reply.  Then "You are good to
> go."  In other words, *the analyst didn't have to factor in any greater credit risk for*
> *an issuer known for poor quality loans, even though three weeks earlier S&P*
> *analysts had circulated an article about how Fremont had severed ties with 8,000*
> *brokers due to loans with some of the highest delinquency rates in the industry*.
> In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of
> RMBS securities backed by Fremont mortgages.  By October, both companies
> began downgrading the CDO.   Today all five AAA tranches have been
> downgraded to junk status.

*Id*. (emphasis added).

127.    Fremont currently faces a lawsuit filed by Cambridge Place Investment, Inc.,

which is mentioned in this August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in
> court documents about the reckless lending practices that dominated the subprime
> market during the real estate boom.

> Fremont, for example, regularly approved loans with unrealistic stated incomes –
> such as pizza delivery workers making $6,000 a month, according to the lawsuit.

> Other Fremont witnesses said in court documents that loan officers spotted and
> ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*,

MYRTLE BEACH SUN-NEWS, Jan. 13, 2011, at A.  On September 28, 2012, the court denied in

principal part Defendants' Joint Motion to Dismiss For Failure to State a Claim.  *See Cambridge*

*Place Inv. Mgmt. Inc. v. Morgan Stanley & Co., Inc., et al.*, Case No. 10-2741 (Mass. Super).

- 42 -

128.    On December 21, 2011, the Federal Housing Finance Agency ("FHFA") filed an amended complaint against UBS Americas, Inc., alleging securities laws violations concerning RMBS purchases made by Freddie Mac and Fannie Mae.  In the complaint, the FHFA alleged:

> A confidential witness who previously worked at Fremont in its system operations and underwriting sections stated that Fremont consistently cut corners and sacrificed underwriting standards in order to issue loans.  He noted that "Fremont was all about volume and profit," and that when he attempted to decline a loan, he was regularly told "you have signed worse loans than this."  The same witness also said that employees at Fremont would create documents that were not provided by the borrowers, including check stubs and tax documents, in order to get loans approved.  The confidential witness stated that Fremont regularly hired underwriters with no experience, who regularly missed substantial numbers of answers on internal underwriting exams.  He explained that like many Fremont employees, he quit because he was uncomfortable with the company's practices.

See Federal Housing Fin. Agency v. UBS Americas, Inc., Case No. 11 Civ. 05201 (S.D.N.Y.) (Second Amended Complaint, filed Dec. 21, 2011).  The court denied a motion to dismiss the complaint in May 2012.  See Federal Housing Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306 (S.D.N.Y. 2012).  On July 25, 2013, the FHFA announced that it had reached an agreement to settle the case for $885 million.

129.    Fremont was also included in the 2008 "Worst Ten in the Worst Ten" Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver, Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit, Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis, Tennessee.  See 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten of the Worst Ten" Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas, Nevada and Modesto, California; and 8th

in Bakersfield, California and Merced, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4.    IndyMac's Systematic Disregard of Underwriting Standards

130.    On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac's parent, IndyMac Bancorp, Inc., filed for bankruptcy on July 31, 2008.

131.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

132.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id*.

133.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market."  *Id*. at 11, 21.  The IndyMac OIG

Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id*. at 11.

134.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id*. at 2-3.

135.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

136.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id*. at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed. *See id*.

137.    In June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac:  What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf.  The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices.  CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties.  CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

138.   CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

139.   The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

140.   The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id*. at 3.

141.   Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8.  These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

142.   The CRL also found evidence that:  (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.  For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed.  "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL.  "And then they pressure you to approve it."

> The refrain from managers, Miller recalls, was simple:  "Find a way to make this work."

*Id*. at 9 (footnote omitted).

143.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:  "I would reject a loan and the insanity would begin.  It would go to upper management and the next thing you know it's going to closing."  *Id*. at 1, 3.  Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors."  *Id*. at 8.

144.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time.  *See id.* at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says.  "There were some loans that were just blatantly overstated. . . .  Some of these loans are very questionable.  They're not going to perform."

*Id*. at 10.

145.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id*. at 14.

146.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D.

4226143.1

Cal. filed July 2, 2010). The case was tried in late 2012, and the jury entered verdict in favor of the FDIC.

147.    IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS. *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009). On June 21, 2010, the class action lawsuit survived a motion to dismiss.

148.    IndyMac's failure to abide by its underwriting standards left investors holding severely downgraded junk securities. As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report. IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009. *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### 5.    MortgageIT's Systematic Disregard of Underwriting Standards

149.    MortgageIT is a residential mortgage banking company headquartered in New York, New York. On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products. Less than a year after the acquisition, MortgageIT began its precipitous decline from one of the largest mortgage originators in the country, laying off hundreds of employees and closing multiple branches.

150.    MortgageIT faces a civil mortgage fraud lawsuit brought in May 2011 by the United States Department of Justice ("DOJ") that alleges MortgageIT made repeated false certifications to the U.S. Department of Housing and Urban Development ("HUD") in connection with its residential mortgage origination and sponsorship practices. *See United States*

4226143.1

*v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y.).  An amended

complaint was filed on August 22, 2011 ("DOJ Complaint").

151.    The United States alleges that "MortgageIT repeatedly lied to be included in a

Government program to select mortgages for insurance by the Government.  Once in that

program, they recklessly selected mortgages that violated program rules in blatant disregard of

whether borrowers could make mortgage payments."  DOJ Complaint ¶ 1.

152.    According to the DOJ Complaint, "As of June 2011, HUD has paid more than

$368 million in FHA insurance claims and related costs arising out of MortgageIT's approval of

mortgages for FHA insurance.  Many of those claims arose out of FHA mortgage insurance

provided by HUD based on MortgageIT's false certifications of due diligence."  *Id*. ¶ 233.

153.    The complaint also alleges that MortgageIT chronically understaffed quality

control: "Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT

conducting quality control reviews of closed FHA-insured mortgages was the Government Loan

Auditor.  His review of closed FHA-insured mortgages continually declined during that period,

and declined most significantly after Deutsche Bank acquired MortgageIT.  By the end of 2007,

the Government Loan Auditor was no longer spending any time conducting quality control

reviews of closed mortgage files.  To increase sales, Deutsche Bank and MortgageIT shifted his

work from quality control reviews of closed mortgages (*i.e.*, quality control audits) to assistance

with production.  By the end of 2007, not a single person at Deutsche Bank or MortgageIT was

conducting quality control reviews of closed FHA-insured mortgages, as required by HUD

rules."  *Id*. ¶ 143-144.

154.    MortgageIT allegedly also ignored quality control measures.  For example,

MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-

insured loans.  The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT.  The findings included identification of serious underwriting violations.  Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters."  It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read.  Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations."  *Id*. ¶ 111-124.

155.    The Amended DOJ Complaint further alleges that "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud."  *Id.* ¶ 145.

156.    Additionally, the complaint alleges that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles."  *Id*. ¶ 162.

157.    The complaint cites many examples of MortgageIT's failure to perform due diligence.  These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- and failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

158.    On May 9, 2012, the parties settled the case for $202.3 million.

### 6.    New Century's Systematic Disregard of Underwriting Standards

159.    New Century Mortgage Corporation and NC Capital Corporation were subsidiaries of New Century Financial Corp. (collectively "New Century").  New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone.

160.    New Century failed amid revelations that its books contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding.  The circumstances leading to its collapse tell the story of a company— like so many other lenders of the time—that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

161.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500. Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan. They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, COLUMBUS DISPATCH, June 2, 2008, at 1A.

162.    The article continued:

Lending experts and consumer advocates say New Century was the poster child for the subprime tsunami – a company that relaxed lending standards so much that even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id.*

163.    New Century's foreclosure rates reflected its inattention to underwriting standards.  Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted.  Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

164.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in— Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California,

Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-Fairfield-Napa, California.

165.     The U.S. Bankruptcy Court of the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures.  The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting.  His final report to the Bankruptcy Court dated February 29, 2008 (the "Examiner's Report") was unsealed and publicly released on March 26, 2008.

166.     The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes."  Examiner's Report, at 2.  The Examiner summarized the findings:

- "New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named 'CloseMore University.' Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels." *Id*. at 3.

- "The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

- "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management

in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id.*

- "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id.* at 3-4.

- "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id.* at 4.

- "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses." *Id.*

- The Examiner's Report also stated that New Century's underwriting and appraisal systems were antiquated. Rather than undertaking sophisticated risk assessments, New Century relied on outdated manual systems that, according to a member of New Century management interviewed by the Examiner, allowed New Century to "finagle anything." *Id.* at 54.

167. Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id.* at 61-62.

168. From 2003 to 2006, New Century began peddling riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated

4226143.1

with such products.  For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%.  And from 2004 to 2005, the percentage of interest-only ARMs rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases.  New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years.  *Id*. at 57, 125-26.

169.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans—with such loans representing at least 42% of New Century's total loan volume. (Table, Missal 57).  "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income.  Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income. (Examiner's Report, at 58).  New Century actively discouraged its employees from even seeking to verify whether a prospective borrower's stated income was reasonable.  *Id*. at 127 n.314.

170.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines.  Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines."  *Id*. at 109.

4226143.1

171.    The Examiner found:

- New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004.  For example, in April 2004, New Century's Chief Credit Officer reported that 'the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels' and that 'Investor Rejects [kickouts] are at an incline as well.'  Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have so many issues pertaining to quality and process!'"

*Id*. at 110.

172.    In 2005, New Century began internal audits of its loan origination and production processes.  An audit of the Sacramento wholesale fulfillment center revealed a number of "high risk" problems, including the fact that 45% of the loans reviewed had improper RESPA disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions with respect to the calculation or verification of income, and 23% had appraisal exceptions or problems.  *See id*. at 152.

173.    Further adding to the problem was the fact that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy."  *Id*. at 174.

174.    With no policy in place, the granting of exceptions was arbitrary.  Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale."  *Id*. at 111.

175.    The Examiner reported:

New Century's loan originations grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005.  The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume.   While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id*. at 113.

176.    New Century consistently prioritized the origination of new loans over virtually all other concerns, including loan quality.  Despite after-the-fact assertions by some company spokespeople that such disregard was anomalous, New Century leaders articulated priorities demonstrating that the disregard was, in fact, systematic.  For example, Patrick Flanagan, who until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized maintaining New Century's loan production even when field audits revealed loan quality problems." *Id*. at 89.  Even after Flanagan left the company, New Century's prioritization of volume, rather than quality, continued.

177.    The Examiner noted that New Century's Quality Assurance Department would run audit reports after loans were funded to determine if the loan file evidenced compliance with New Century's underwriting guidelines.  "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files."  Despite this fact, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance." *Id*. at 137.

- 57 -

178.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of loans.  For instance, the Examiner reported that management had determined a way to identify underwriters whose actions led to a high number of defective loans in October 2005, but failed to implement the effort until much later.  *See id*. at 169 n.337.

179.    The Examiner's Report found that loan quality trends "worsened dramatically" at New Century in 2006 and early 2007.  Although New Century made a belated effort to improve loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the same sorts of problems, including defective appraisals and missing documentation continued to be the main reasons for investors kicking out increasing quantities of New Century loans."  *Id*. at 157-58.

180.    The Examiner concluded, "New Century knew from multiple data sources that its loan quality was problematic, starting no later than 2004.  Yet… the Board of Directors and Senior Management before 2006 took few steps to address the troubling loan quality trends."  *Id*. at 175.

181.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC.  She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . .  Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed lending decision. These same sales mangers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. Some of the best sales

managers had underwriting backgrounds and were more closely aligned with risk management and better at understanding potential problems, but this was the exception and not the rule.

*Section 2: Subprime Origination and Securitization Before the Fin. Crisis. Inquiry Comm'n*

(Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New

Century).

182.    She also testified as to systematic problems in the appraisal process:

In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods. They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

183.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less."  *Id*.

184.    In December 2009, the SEC filed a complaint charging three former New Century

executives with securities fraud.  *See Securities & Exchange Commission v. Morrice, et al.*, Case

No. SACV09-01426 JVS (C.D. Cal. filed Dec. 7, 2009).  The SEC's complaint alleges that the

New Century executives misled investors as to the deterioration of New Century's loan portfolio,

including dramatic increases in early default rates and loan repurchases/repurchase requests.  On

July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court

approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil

penalties; (2) be permanently enjoined from further securities law violations and (3) a five-year

ban on  serving as an officer or director of a public company.

### 7.    Wells Fargo's Systematic Disregard of Underwriting Standards

185.    The City of Memphis sued Wells Fargo over their mortgage practices claiming

violations of the Fair Housing Act.  *See* First Am. Compl., *City of Memphis v. Wells Fargo Bank,*

*N.A.*, No. 09-2857, Doc. 29 (W.D. Tenn. filed Apr. 7, 2010) ("*Memphis* Compl.").  The

complaint includes sworn declarations from former Wells Fargo employees describing Wells

Fargo's abandonment of underwriting guidelines.

186.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to

January 2008.  She was responsible for handling the paperwork involved in the loan, including

processing the file for review and approval by the underwriters.  In order to do her job, she had

to be familiar with Wells Fargo's underwriting guidelines.   Ms. Thomas recounted how the

bonus structure placed pressure on credit managers to make loans that should not have been

made.  She stated that managers manipulated LTV ratios by using inflated appraisals that they

were not accurate.  She also knew that documents were falsified to inflate borrowers' incomes.

When she complained, a branch manager told her, "we gotta do what we gotta do."  Finally, she

stated that borrowers were not informed that their loans were adjustable-rate mortgages with low

"teaser rates," or about prepayment penalties, potential violations of lending laws, which would

also be violations of the underwriting guidelines.  *Memphis* Compl., Doc. 29-4, Thomas Decl.

(W.D. Tenn. filed Apr. 7, 2010).

187.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008

in the Memphis area.  Her responsibility was to find potential borrowers.  She stated that the

district manager put pressure on credit managers to convince people to apply for loans even if the

person could not afford the loan or did not qualify for it.  To her shock, many people with very

bad credit scores and high debt-to-income ratios were approved for subprime loans.  Ms. Dancy

4226143.1

would shake her head in disbelief and ask herself, "how could that happen?"  She knew that

Wells Fargo violated its underwriting guidelines in order to make those loans.  Although she

never witnessed it herself, she heard also from other employees that some branch managers

falsified information in order to get customers to qualify for subprime loans.  She stated that a

bonus system was used to pressure her to make loans that she thought should not be made.

*Memphis* Compl., Doc. 29-1, Dancy Decl. (W.D. Tenn. filed Apr. 7, 2010).

188.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to

2008 in the Memphis area.  According to Mr. Simpson, Wells Fargo managers falsified the

mileage on car loan applications so that the loan would be approved.  He also stated that Wells

Fargo was "very aggressive" in mortgage lending.  The culture was "completely results driven."

According to Mr. Simpson, Wells Fargo employees did not tell customers about the fees and

costs associated with closing a loan – again, potential violations of lending laws, and thus also

violations of the underwriting guidelines.  He also knew managers who falsified information in

loan files, such as income documentation, in order to get loans approved.  Mr. Simpson further

confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the

loans.  *Memphis* Compl., Doc. 29-2, Simpson Decl. (W.D. Tenn. filed Apr. 7, 2010).

189.    Mario Taylor was a Wells Fargo credit manager from June 2006 to February 2008

in the Memphis area.  His job was to find potential borrowers and to get them to apply for loans.

His manager pressured him to push loan on borrowers regardless of whether they were qualified

for the loan or could pay back the loan.  He was also told to mislead borrowers by only telling

them the "teaser rate" without disclosing the rate was adjustable and by not telling them about

the "fine print."  One of his branch managers changed pay stubs and used white-out on

documents to alter the borrower's income.  Finally, Mr. Taylor confirmed that Wells Fargo

employees were heavily incentivized by the bonus structure to generate large volumes of loans. *Memphis* Compl., Doc. 29-3, Taylor Decl. (W.D. Tenn. filed Apr. 7, 2010).

190.    Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007 in the Maryland area.  She described the financial incentives to sign borrowers up for loans.  In two years, she made more than $1.2 million in sales commissions. She knew loan officers who would lie to potential borrowers about whether they would be able to refinance their loan once the "teaser rate" period expired.  Ms. Jacobson also knew loan officers who actually falsified loan applications in order to qualify them for loans that they should not have been given.  One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications.  She reported this conduct to management but was not aware of any action that was taken to correct the problems.  *Memphis* Compl., Doc. 29-7, Jacobson Decl. (W.D. Tenn. filed Apr. 7, 2010).

191.    The district court denied a motion to dismiss.  *City of Memphis v. Wells Fargo Bank, N.A.*, 2011 WL 1706756 (W.D. Tenn. May 4, 2011).  The case subsequently settled.

192.    The FCIC's investigation supports the affidavits of these former Wells Fargo employees.  The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until 2007.  According to Ms. Parmer, at least half the loans she flagged as fraudulent were approved nonetheless.  She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never referred to the Treasury Department's Financial Crimes Enforcement Network.  FCIC Report at 162.

193.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. and Wells Fargo

4226143.1

Financial, Inc.  At the time, this was the largest penalty assessed by the Board in a consumer-

protection enforcement action.  Among other things, the order addressed allegations that Wells

Fargo had falsified income information in mortgage applications.  These practices were allegedly

fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of

adequate controls to manage the risks resulting from these programs.  Press Release, Federal

Reserve Board (July 20, 2011), *available at*

http://www.federalreserve.gov/newsevents/press/enforcement/20110720a.htm.

> **E.      Loans That Did Not Comply with the Underwriting Guidelines Were
> Routinely Collateral for UBS-Underwritten RMBS**

194.     A February 2010 report from J.P. Morgan noted that "[t]he outstanding balance of

[private-label] mortgages grew from roughly $600 billion at the end of 2003 to $2.2 trillion at its

peak in 2007."  Gary J. Madich et al, *Non-Agency Mortgage-Backed Securities:  Managing*

*Opportunities and Risks*, J.P. Morgan Asset Management at 2 (Feb. 2010), *available at*

http://www.jpmorganinstitutional.com/cm/BlobServer/Non-Agency_Mortgage-

Backed_Securities.pdf?blobkey=id&blobwhere=1321504668623&blobheader=application%2Fp

df&blobcol=urldata&blobtable=MungoBlobs&isAMIA=yes.  While unknown to reasonable

investors at that time, it now is apparent that this massive expansion in the origination of loans

over a short period of time was accomplished by ignoring underwriting standards.  The J.P.

Morgan report also noted that home prices rose, requiring larger loans:  "[private-label] mortgage

providers initially met this need for larger loans while maintaining stringent qualifications.

However, investment banks were willing to buy lower quality mortgages and bundle them for

issuance into new and innovative forms of Asset Backed Securities (ABS) and Collateralized

Debt Obligations (CDOs)."  *Id.*

- 63 -

195.     During the FCIC investigation referenced above (*supra* at Section VII.D.1),
Clayton Holdings provided evidence that Barclays securitized a significant number of loans that
did not comply with the stated underwriting guidelines.

196.     Clayton was the leading provider of due diligence services for RMBS offerings
during the relevant time period.  This gave Clayton "a unique inside view of the underwriting
standards that originators were actually applying."  FCIC Report at 166.

197.     Banks routinely hired Clayton to inspect the mortgage loans that the banks
securitized into RMBS.  Clayton would determine whether the loans complied with the
originators' stated underwriting guidelines, and prepare a report of its findings for the bank.  *See*
FCIC Testimony of Vicki Beal, Senior Vice President of Clayton Holdings (Sept. 23, 2010),
available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Beal.pdf.

198.     From January 1, 2006 through June 30, 2007, Clayton reviewed 911,039 loans.
Only 54% of those met the originators' underwriting guidelines.  Clayton's former President and
CEO, Keith Johnson, testified that the "54% says there [was] a quality control issue in the
[originators]."  FCIC Report at 166; Audiotape of FCIC Interview with Keith Johnson, former
President of Clayton ("Johnson FCIC Interview") (Sept. 2, 2010) ("Even if the guideline was bad,
[the loans] didn't adhere to the guideline . . . .  To me in hindsight, [the data] just said there was
a . . . fundamental breakdown."), available at http://fcic.law.stanford.edu/interviews/view/220.
Another 18% of the loans failed the underwriting guidelines but were deemed to have adequate
compensating factors.  That left a large number – 28% – that did not meet the underwriting
guidelines and had no compensating factors.  *See* All Clayton Trending Reports, 1st Quarter 2006
– 2nd Quarter 2007, at 1 (2007), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-
testimony/2010-0923-Clayton-All-Trending-Report.pdf ("All Clayton Trending Report").

4226143.1

199.     Clayton confirmed that the RMBS sold by Barclays from the beginning of 2006 through the middle of 2007—which includes all of the certificates listed in Table 1 this Complaint—contained a substantial number of loans that were not originated in conformity with underwriting guidelines.  *See* All Clayton Trending Report at 3.

200.     As revealed during the FCIC investigation in 2010, Clayton routinely found large numbers of loans that were not properly originated under the applicable underwriting guidelines. Despite identifying these defectively originated loans, Clayton stated that they often were included into the RMBS that was being sold to investors.  *See* FCIC Report at 166-67; All Clayton Trending Report at 1.

201.     Clayton reviewed 6,275 loans for Barclays.  It found that 1,711 (27%) did not comply with the stated underwriting guidelines and did not have compensating factors.  Barclays waived the defects for 471 of the 1,711 (27.5%).

202.     Clayton typically performed due diligence on a small sample of the loans that were being securitized into an RMBS offering – approximately 10%.  FCIC Testimony of Vicky Beal at 2.  No due diligence was performed on the remaining loans.  Thus, of the small sample of loans that Clayton did review, approximately 7% did not comply with the underwriting guidelines and did not have compensating factors, but were nonetheless securitized. Extrapolating Clayton's results shows that for the remaining 90% of loans that were not reviewed, approximately 25% did not comply with the underwriting guidelines and did not have compensating factors, but were nonetheless securitized.  In total, Clayton's data shows that approximately 25% of the loans Barclays securitized were defective.  All Clayton Trending Reports at 3.

F.      **Additional Evidence Confirms That Defective Loans Were Routinely Packaged into UBS's RMBS.**

203.    Clayton officials offered an explanation for why so many defective loans were packaged into RMBS.  When asked what caused the financial crisis, one pointed to the banks belief that they had no liability for loans' compliance with underwriting guidelines: "When it came to the underwriting [guidelines] . . . and [securitizers] could perhaps distribute that risk quickly, then that wasn't as high on their priorities."  Johnson FCIC Interview.

204.    A number of loan originators had an express policy of attempting to sell loans that had already been rejected.  Because only a small percentage of the pools were reviewed by a due diligence firm like Clayton (or its chief competitor, Bohan), there was a very strong likelihood that those defective loans would enter the pool on the second or third attempt.  Clayton referred to this practice as the "three strikes, you're out rule."  Transcript, FCIC Hearing, The Financial Crisis at the Community Level—Sacramento, CA at 178 (Sept. 23, 2010) (testimony of D. Keith Johnson, former President of Clayton), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-transcript.pdf.

205.    The FCIC Report also concluded that banks like Barclays that securitized loans were reluctant to review or reject loans in greater numbers because doing so would endanger their relationship with originators.  FCIC Report at 166 ("[Clayton's former CEO] concluded that his clients often waived in loans to preserve their business relationship with the loan originator— a high number of rejections might lead the originator to sell the loans to a competitor."); Paul Muolo and Matthew Padilla, Chain of Blame 228 (2010) ("There were two reasons the [Wall] Street firms reviewed only a small sample of the loans they were buying . . . .  The most important reason was the relationship with the lender.  'The lower the sample you requested [of the lender], the more likely it was that you'd win the bid.'").

- 66 -

## VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

206.    The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

207.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the loans adhered to the applicable underwriting guidelines, including that exceptions to those guidelines would only be granted when warranted by compensating factors; (2) the loans adhered to certain underwriting standards for reduced documentation programs; and (3) that appraisals were accurate, that loans had certain LTV ratios individually and in the aggregate, and that the borrowers had certain debt-to-income ("DTI") ratios.

208.    The following table lists the originators that contributed loans to each RMBS, as identified in the Offering Documents.  Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).  For the RMBS listed below, the Offering Documents included only those underwriting guidelines for the Originators that contributed more than 20% of the loans to the RMBS.

**Table 6**
*Originators Supplying Loans for Each RMBS at Issue*

| CUSIP | Issuing Entity | Tranche | Originator(s) |
|-------|---------------|---------|---------------|
| 05529DAA0 | BCAPB LLC Trust 2007-AB1 | A-1 | Wells Fargo Bank, N.A. (100%) |
| 05530PAP7 | BCAP LLC Trust 2007-AA1 | 2-A-1 | IndyMac Bank, F.S.B.  (100%) |
| 05530NAA5 | BCAP LLC Trust 2007-AA2 | 1-2-A-1 | Countrywide Home Loans, Inc. (100%) |

| CUSIP | Issuing Entity | Tranche | Originator(s) |
|-------|----------------|---------|---------------|
| 05530VAB5<br>05530VAN9<br>05530VAP4 | BCAP LLC Trust 2007-AA3 | 1-A-1-B<br>2-A-1-A<br>2-A-1-B | Group 1: Wells Fargo Bank, N.A. (87.02%)<br>MortgageIT, Inc. (9.75%)<br><br>Group 2: Countrywide Home Loans (100%) |
| 35729TAD4 | Fremont Home Loan Trust 2006-C | 2-A-2 | Fremont Investment & Loan (100%) |
| 81377AAD4 | Securitized Asset Backed Receivables LLC Trust 2006-HE2 | A-2-C | Fremont Investment & Loan (46.98%)<br>NC Capital Corp. (43.68%)<br>Aegis Mortgage Corp. (approx. 10%) |
| 9497EBAB5 | Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust | A-2 | Wells Fargo Bank, N.A. (100%) |
| 9497EVAB1 | Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust | A-2 | Wells Fargo Bank, N.A. (100%) |

209.    Examples of material untrue statements and/or omissions of fact in the Offering

Documents of the RMBS listed above follow.

**A.    Untrue Statements Concerning Adherence to Underwriting Guidelines**

210.    The BCAP LLC Trust 2007-AA2 Prospectus Supplement provided the following

description of Countrywide's underwriting guidelines:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtains employment verification providing current and historical income information and/or a telephonic employment confirmation. Such employment verification may be obtained, either through analysis of the prospective borrower's recent pay stub and/or W-2 forms for the most recent two years, relevant portions of the most recent two years' tax returns, or from the prospective borrower's employer, wherein the employer reports the length of employment and current salary with that organization. Self-employed prospective borrowers generally are required to submit relevant portions of their federal tax returns for the past two years.
>
> In assessing a prospective borrower's creditworthiness, Countrywide Home Loans may use FICO Credit Scores. "FICO Credit Scores" are statistical credit scores designed to assess a borrower's creditworthiness and likelihood to default on a consumer obligation over a two-year period based on a borrower's credit history. FICO Credit Scores were not developed to predict the likelihood of default on

- 68 -

mortgage loans and, accordingly, may not be indicative of the ability of a borrower to repay its mortgage loan. FICO Credit Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. Under Countrywide Home Loans' underwriting guidelines, borrowers possessing higher FICO Credit Scores, which indicate a more favorable credit history and who give Countrywide Home Loans the right to obtain the tax returns they filed for the preceding two years, may be eligible for Countrywide Home Loans' processing program (the "Preferred Processing Program").

Periodically the data used by Countrywide Home Loans to complete the underwriting analysis may be obtained by a third party, particularly for mortgage loans originated through a loan correspondent or mortgage broker. In those instances, the initial determination as to whether a mortgage loan complies with Countrywide Home Loans' underwriting guidelines may be made by an independent company hired to perform underwriting services on behalf of Countrywide Home Loans, the loan correspondent or mortgage broker. In addition, Countrywide Home Loans may acquire mortgage loans from approved correspondent lenders under a program pursuant to which Countrywide Home Loans delegates to the correspondent the obligation to underwrite the mortgage loans to Countrywide Home Loans' standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by Countrywide Home Loans before acquisition of the mortgage loan and the correspondent represents that Countrywide Home Loans' underwriting standards have been met. After purchasing mortgage loans under those circumstances, Countrywide Home Loans conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including Countrywide Home Loans' prior experience with the correspondent lender and the results of the quality control review process itself.

Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

BCAP LLC Trust 2007-AA2 Prospectus Supplement at S-66.  *See also* BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-66-67.

211.    The BCAP LLC Trust 2007-AA2 Prospectus Supplement stated:

- 69 -

Exceptions to Countrywide Home Loan's underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

BCAP LLC Trust 2007-AA2 Prospectus Supplement at S-67.  *See also* BCAP LLC Trust 2007-

AA3 Prospectus Supplement at S-68.

212.    The BCAP LLC Trust 2007-AA3 Prospectus Supplement stated:

The mortgage loans in loan group I, except for approximately 12.98% of such mortgage loans which Wells Fargo acquired from various other loan sellers, including Mortgage IT, have been underwritten in accordance with one or more of the following: (i) Wells Fargo Bank's "general" underwriting standards, (ii) Wells Fargo Bank's modified underwriting standards that have been applied in the underwriting of mortgage loans under Wells Fargo Bank's "alternative" mortgage loan underwriting program, and (iii) the underwriting standards of participants in Wells Fargo Bank's non-agency conduit program.

BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-55.  *See also* BCAP LLC Trust 2007-

AB1 Prospectus Supplement at S-40.

213.    The BCAP LLC Trust 2007-AA3 Prospectus Supplement stated:

Wells Fargo Bank's underwriting standards are applied by or on behalf of Wells Fargo Bank to evaluate the applicant's credit standing and ability to repay the mortgage loan, as well as the value and adequacy of the mortgaged property as collateral. The underwriting standards that guide the determination represent a balancing of several factors that may affect the ultimate recovery of the mortgage loan amount, including, among others, the amount of the mortgage loan, the ratio of the mortgage loan amount to the property value (i.e., the lower of the appraised value of the mortgaged property and the purchase price), the borrower's means of support and the borrower's credit history. Wells Fargo Bank's guidelines for underwriting may vary according to the nature of the borrower or the type of loan, since differing characteristics may be perceived as presenting different levels of risk. With respect to certain mortgage loans, the originators of such loans may have contracted with unaffiliated third parties to perform the underwriting process.

Wells Fargo Bank supplements the mortgage loan underwriting process with either its own proprietary scoring system or scoring systems developed by third parties such as Freddie Mac's Loan Prospector, Fannie Mae's Desktop Underwriter or scoring systems developed by private mortgage insurance companies. These scoring systems assist Wells Fargo Bank in the mortgage loan approval process by providing consistent, objective measures of borrower credit

- 70 -

and certain loan attributes. Such objective measures are then used to evaluate loan applications and assign each application a "Mortgage Score."

. . . .

The Mortgage Score is used to determine the type of underwriting process and which level of underwriter will review the mortgage loan file. For transactions which are determined to be low-risk transactions, based upon the Mortgage Score and other parameters (including the mortgage loan production source), the lowest underwriting authority is generally required. For moderate and higher risk transactions, higher level underwriters and a full review of the mortgage file are generally required. Borrowers who have a satisfactory Mortgage Score (based upon the mortgage loan production source) are generally subject to streamlined credit review (which relies on the scoring process for various elements of the underwriting assessments). Such borrowers may also be eligible for a reduced documentation program and are generally permitted a greater latitude in the application of borrower debt-to-income ratios.

BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-55-56. *See also* BCAP LLC Trust

2007-AB1 Prospectus Supplement at S-40-41.

214.    The BCAP LLC Trust 2007-AA3 Prospectus Supplement stated:

In comparison to Wells Fargo Bank's "general" underwriting standards described above, the underwriting standards applicable to mortgage loans under Wells Fargo Bank's "alternative" mortgage loan underwriting program permit different underwriting criteria, additional types of mortgaged properties or categories of borrowers such as "foreign nationals" without a FICO Score who hold certain types of visas and have acceptable credit references (such mortgage loans, "Foreign National Loans"), and include certain other less restrictive parameters. Generally, relative to the "general" underwriting standards, these standards include higher loan amounts, higher maximum Loan-to-Value Ratios, higher maximum "combined" Loan-to-Value Ratios (in each case, relative to mortgage loans with otherwise similar characteristics) in cases of simultaneous primary and secondary financings, less restrictive requirements for "equity take out" refinancings, the removal of limitations on the number of permissible mortgage loans that may be extended to one borrower financing a primary residence and the ability to originate mortgage loans with Loan-to-Value Ratios in excess of 80% without the requirement to obtain primary mortgage insurance if such loans are secured by cooperatives or investment properties.

On July 10, 2006, Wells Fargo Bank implemented new expanded financing solutions for underwriting their "alternative" mortgage loans (the "EFA Program"). Under the EFA Program, mortgage loans are divided into two general categories, "Alt-A Prime" and "Alt-A Minus." Borrower and mortgage loan

- 71 -

characteristics will determine whether a mortgage loan falls within the Alt-A Prime or Alt-A Minus category. The differences between these categories are discussed in this prospectus supplement under the heading "The Original Loan Seller."  All "alternative" mortgage loans originated by Wells Fargo Bank on and after July 10, 2006, were originated under the EFA Program guidelines.

BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-59.  *See also* BCAP LLC Trust 2007-

AB1 Prospectus Supplement at S-45-46.

215.    The Fremont Home Loan Trust 2006-C Prospectus stated:

Fremont Investment & Loan provides underwriters with specific underwriting guidelines and maintains strict control procedures to manage the quality of its originations at all locations.

Fremont Home Loan Trust 2006-C Prospectus, July 11, 2006, at 74.

216.    The Fremont Home Loan Trust 2006-C Prospectus also stated:

Generally, Fremont Investment & Loan's guidelines require an analysis of the following:

- a borrower's creditworthiness, as reflected in particular by the borrower's credit history and employment stability,

- a borrower's "debt-to-income ratio," which measures a borrower's projected income relative to the proposed mortgage payment and to other fixed obligations, and

- the "loan-to-value ratio" of the proposed loan, which measures the adequacy of the mortgaged property to serve as the collateral for a mortgage loan.

Fremont Home Loan Trust 2006-C Prospectus, July 11, 2006, at 74.

217.    The Fremont Home Loan Trust 2006-C Prospectus stated:

A borrower's lack of credit payment history and/or relatively low Credit Score, however, will not necessarily preclude Fremont Investment & Loan from making a loan if other favorable borrower characteristics exist, including an adequate debt-to-income ratio or sufficient equity in the property.

Fremont Home Loan Trust 2006-C Prospectus, July 11, 2006, at 75.

218.    The Fremont Home Loan Trust 2006-C Prospectus Supplement represented:

Fremont's underwriting guidelines are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The Scored Programs assess the risk of default by using Credit Scores obtained from third party credit repositories along with, but not limited to, past mortgage payment history, seasoning on bankruptcy and/or foreclosure and loan-to-value as an aid to, not a substitute for, the underwriter's judgment. All of the mortgage loans in the mortgage pool were underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market.

Fremont Home Loan Trust 2006-C Prospectus Supplement at S-39.  *See also* Securitized Asset

Backed-Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-45.

219.    The Fremont Home Loan Trust 2006-C Prospectus stated:

The mortgage loans were underwritten in accordance with Fremont's current underwriting programs, referred to as the Scored Programs ("Scored Programs"). Fremont Investment & Loan began originating mortgage loans pursuant to Scored Programs in 2001 and the Scored Programs have been the exclusive type of origination programs beginning in 2004. Within the Scored Programs, there are three documentation types, Full Documentation, Easy Documentation, and Stated Income. All of the mortgage loans were originated in accordance with Fremont Investment & Loan's underwriting guidelines, subject to various exceptions as described in this section. A Credit Score is used along with, but not limited to, mortgage payment history, seasoning on bankruptcy and/or foreclosure, loan-to-value ratio as an aid to, not a substitute for, the underwriter's judgment. Fremont Investment & Loan's underwriting staff fully reviews each loan to determine whether it's underwriting guidelines for income, assets, employment and collateral are met.

Fremont Home Loan Trust 2006-C Prospectus, July 11, 2006, at 76-77.

220.    The Fremont Home Loan Trust 2006-C Prospectus also stated:

Fremont Investment & Loan conducts a number of quality control procedures, including a post-funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality.

Fremont Home Loan Trust 2006-C Prospectus, July 11, 2006, at 78.  *See also* Securitized Asset

Backed-Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-47.

221.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions. Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify. IndyMac Bank's underwriting standards for mortgage loans are primarily intended to evaluate the borrower's creditworthiness and the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, as well as the type and intended use of the mortgaged property. Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent that these programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and credit losses.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-54-55.

222.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

IndyMac Bank has two principal underwriting methods designed to be responsive to the needs of its mortgage loan customers: traditional underwriting and e-MITS (Electronic Mortgage Information and Transaction System) underwriting. E MITS is an automated, internet-based underwriting and risk-based pricing system. IndyMac Bank believes that e-MITS generally enables it to estimate expected credit loss, interest rate risk and prepayment risk more objectively than traditional underwriting and also provides consistent underwriting decisions. IndyMac Bank has procedures to override an e-MITS decision to allow for compensating factors.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-54.

223.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

Underwriting procedures vary by channel of origination. Generally, mortgage loans originated through the mortgage professional channel will be submitted to e-MITS for assessment and subjected to a full credit review and analysis. Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines. Mortgage loans originated through the consumer direct channel are subjected to essentially the same procedures, modified as necessary to reflect the fact that no third-party contributes to the preparation of the credit file.

- 74 -

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-57.

224.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-57.

225.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-56.

226.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-55.

227.    The Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus

Supplement stated:

Underwriting Standards. The mortgage loans originated or acquired by New Century, referred to in this section as the originator, were done so in accordance with the underwriting guidelines established by it (collectively, the "New Century Underwriting Guidelines"). The following is a general summary of the New Century Underwriting Guidelines believed to be generally applied, with some

- 75 -

variation, by the originator. This summary does not purport to be a complete description of the underwriting standards of New Century.

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the mortgage loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the mortgage loan. All of the mortgage loans in the mortgage pool were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.

Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-50.

228.    With respect to exceptions, the Securitized Asset Backed Receivables LLC Trust

2006-HE2 Prospectus Supplement stated:

The mortgage loans will have been originated in accordance with the New Century Underwriting Guidelines. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist.  It is expected that a substantial portion of the mortgage loans will represent these exceptions.

Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-50.

229.    The Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus

Supplement stated:

The New Century Underwriting Guidelines have the following categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

"AA" Risk. Under the "AA" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments) are required for loan-to-value ratios above 90%. The borrower must have no late mortgage payments within the last 12 months on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such

- 76 -

bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550, or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"A+" Risk. Under the "A+" risk category, the applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Two or more tradelines (one of which with 24 months history and no late payments), are required for loan-to-value ratios above 90%. A maximum of one 30 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"A-" Risk. Under the "A-" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. A maximum of three 30 day late payments within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 60 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with FICO scores of less than 550; provided,

however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 (or 580 under the stated income documentation program) may have occurred as long as such bankruptcy is discharged at least one day prior to funding of the loan. A maximum loan-to-value ratio of 80% is permitted with respect to borrowers with a FICO score less than or equal to 550 (or 580 with respect to stated income documentation programs) with Chapter 7 bankruptcy, which Chapter 7 bankruptcy is discharged at least one day prior to loan funding. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (any such loan may not exceed a 90% loan-to-value ratio), provided that such borrower has a FICO score of at least 550 or 80% loan-to-value ratio provided that such borrower has a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding two years. The mortgaged property must be in at least average condition.

…

"B" Risk. Under the "B" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day late payments and a maximum of one 60 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 90 days late at the time of funding of the loan. No bankruptcy may have occurred during the preceding year for borrowers with a FICO score less than or equal to 550; provided, however, that a Chapter 7 bankruptcy for a borrower with a FICO score in excess of 550 may have occurred as long as such bankruptcy has been discharged at least one day prior to funding of the loan. A borrower in Chapter 13 bankruptcy may discharge such bankruptcy with the proceeds of the borrower's loan (such loan may not exceed an 80% loan-to-value ratio for borrowers with a FICO score of less than 550). No notice of default filings or foreclosures (or submission of deeds in lieu of foreclosure) may have occurred during the preceding 18 months. The mortgaged property must be in at least average condition.

…

"C" Risk. Under the "C" risk category, an applicant must have a FICO score of 500, or greater, based on loan-to-value ratio and loan amount. Unlimited 30 day and 60 day late payments and a maximum of one 90 day late payment within the last 12 months is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 120 days late at the time of funding of the loan. All bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. No notice of default filings may have occurred during the preceding 12 months. The mortgaged property must be in at least average condition.

…

"C-" Risk. Under the "C-" risk category, an applicant must have a FICO score of 500, or greater. Unlimited 30, 60 and 90 day late payments and a maximum of one 120 day late payment is acceptable on an existing mortgage loan. An existing mortgage loan must be less than 150 days late at the time of funding of the loan. There may be no current notice of default and all bankruptcies must be discharged at least one day prior to funding of the loan; provided, however, that Chapter 13 bankruptcies may be discharged with loan proceeds. The mortgaged property must be in at least average condition.

Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-52-55.

230. The Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust Prospectus stated:

The underwriting guidelines used by Wells Fargo Bank are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral. A prospective borrower applying for a mortgage loan is required to complete a detailed application. The loan application elicits pertinent information about the applicant including, depending on the program, the applicant's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired. With respect to every applicant, a credit report summarizing the applicant's credit history with merchants and lenders is obtained. Significant unfavorable credit information reported by the applicant or by a credit reporting agency is taken into account in the credit decision.

Wells Fargo Home Equity Asset-Backed Securities 2006-3 Prospectus, Dec. 18, 2006, at 35.  *See also* Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust Prospectus, Mar. 23, 2007, at 37.

231. The Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust Prospectus stated:

On a case-by-case basis, Wells Fargo Bank may make the determination that the prospective borrower warrants loan parameters beyond those shown above based upon the presence of acceptable compensating factors. Examples of compensating factors include, but are not limited to, loan-to-value ratio, debt-to-income ratio, long-term stability of employment and/or residence, statistical credit scores, verified cash reserves or reduction in overall monthly expenses.

Wells Fargo Home Equity Asset-Backed Securities 2006-3 Prospectus, Dec. 18, 2006, at 42.  *See also* Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust Prospectus, Mar. 23, 2007, at 40.

232.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made because, among other things, the Originators did not adhere to the stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay the loans, did not properly evaluate whether the borrower's DTI ratio supported a conclusion that the borrower had the means to meet his/her monthly obligations, and did not ensure that adequate compensating factors justified the granting of exceptions to guidelines.

**B.      Untrue Statements Concerning Adherence to Reduced Documentation Program Underwriting Guidelines**

233.    The BCAP LLC Trust 2007-AA2 Prospectus Supplement stated:

In connection with the Standard Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Program, the CLUES Plus Documentation Program or the Streamlined Documentation Program.

The Alternative Documentation Program permits a borrower to provide W-2 forms instead of tax returns covering the most recent two years, permits bank statements in lieu of verification of deposits and permits alternative methods of employment verification.

Under the Reduced Documentation Program, some underwriting documentation concerning income, employment and asset verification is waived. Countrywide Home Loans obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment. Since information relating to a prospective borrower's income and employment is not

- 80 -

verified, the borrower's debt-to-income ratios are calculated based on the information provided by the borrower in the mortgage loan application. The maximum Loan-to-Value Ratio ranges up to 95%.

The CLUES Plus Documentation Program permits the verification of employment by alternative means, if necessary, including verbal verification of employment or reviewing paycheck stubs covering the pay period immediately prior to the date of the mortgage loan application. To verify the borrower's assets and the sufficiency of the borrower's funds for closing, Countrywide Home Loans obtains deposit or bank account statements from each prospective borrower for the month immediately prior to the date of the mortgage loan application. Under the CLUES Plus Documentation Program, the maximum Loan-to-Value Ratio is 75% and property values may be based on appraisals comprising only interior and exterior inspections. Cash-out refinances and investor properties are not permitted under the CLUES Plus Documentation Program.

The Streamlined Documentation Program is available for borrowers who are refinancing an existing mortgage loan that was originated or acquired by Countrywide Home Loans provided that, among other things, the mortgage loan has not been more than 30 days delinquent in payment during the previous twelve-month period. Under the Streamlined Documentation Program, appraisals are obtained only if the loan amount of the loan being refinanced had a Loan-to-Value Ratio at the time of origination in excess of 80% or if the loan amount of the new loan being originated is greater than $650,000. In addition, under the Streamlined Documentation Program, a credit report is obtained but only a limited credit review is conducted, no income or asset verification is required, and telephonic verification of employment is permitted. The maximum Loan-to-Value Ratio under the Streamlined Documentation Program ranges up to 95%.

BCAP LLC Trust 2007-AA2 Prospectus Supplement at S-69. *See also* BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-69.

234.   The BCAP LLC Trust 2007-AA2 Prospectus Supplement also represented:

In connection with the Expanded Underwriting Guidelines, Countrywide Home Loans originates or acquires mortgage loans under the Full Documentation Program, the Alternative Documentation Program, the Reduced Documentation Loan Program, the No Income/No Asset Documentation Program and the Stated Income/Stated Asset Documentation Program. Neither the No Income/No Asset Documentation Program nor the Stated Income/Stated Asset Documentation Program is available under the Standard Underwriting Guidelines.

The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or

- 81 -

the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

Similarly, the same documentation and verification requirements apply to mortgage loans documented under the Reduced Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Reduced Documentation Program, higher loan balances and Loan-to-Value Ratios are permitted for mortgage loans underwritten pursuant to the Expanded Underwriting Guidelines than those permitted under the Standard Underwriting Guidelines. The maximum Loan-to-Value Ratio, including secondary financing, ranges up to 90%. The borrower is not required to disclose any income information for some mortgage loans originated under the Reduced Documentation Program, and accordingly debt-to-income ratios are not calculated or included in the underwriting analysis. The maximum Loan-to-Value Ratio, including secondary financing, for those mortgage loans ranges up to 85%.

Under the No Income/No Asset Documentation Program, no documentation relating to a prospective borrower's income, employment or assets is required and therefore debt-to-income ratios are not calculated or included in the underwriting analysis, or if the documentation or calculations are included in a mortgage loan file, they are not taken into account for purposes of the underwriting analysis. This program is limited to borrowers with excellent credit histories. Under the No Income/No Asset Documentation Program, the maximum Loan-to-Value Ratio, including secondary financing, ranges up to 95%. Mortgage loans originated under the No Income/No Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

Under the Stated Income/Stated Asset Documentation Program, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the stated assets are consistent with the borrower's income. The Stated Income/Stated Asset Documentation Program permits maximum Loan-to-Value Ratios up to 90%. Mortgage loans originated under the Stated Income/Stated Asset Documentation Program are generally eligible for sale to Fannie Mae or Freddie Mac.

BCAP LLC Trust 2007-AA2 Prospectus Supplement Prospectus Supplement at S-70-71.  *See also* BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-71-72.

235.    The BCAP LLC Trust 2007-AA1 Prospectus Supplement represented:

4226143.1

IndyMac Bank originates and purchases loans that have been originated under one of seven documentation programs: Full/Alternate, FastForward, Bank Statement, Stated Income, No Income/No Asset, No Ratio and No Doc.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-55.

236.   The BCAP LLC Trust 2007-AA1 Prospectus Supplement also represented:

Under the Full/Alternate Documentation Program, the prospective borrower's employment, income and assets are verified through written or telephonic communications. All loans may be submitted under the Full/Alternate Documentation Program. The Full/Alternate Documentation Program also provides for alternative methods of employment verification generally using W-2 forms or pay stubs. Borrowers applying under the Full/Alternate Documentation Program may, based on certain credit and loan characteristics, qualify for IndyMac Bank's FastForward program and be entitled to income and asset documentation relief. Borrowers who qualify for FastForward must state their income, provide a signed Internal Revenue Service Form 4506 (authorizing IndyMac Bank to obtain copies of their tax returns), and state their assets; IndyMac Bank does not require any verification of income or assets under this program.

The Bank Statement Documentation Program is similar to the Full/Alternate Documentation Program except that borrowers generally must document income and employment for six months (rather than two, as required by the Full/Alternate Documentation Program). Borrowers under the Bank Statement Documentation Program may use bank statements to verify their income and employment. If applicable, written verification of a borrower's assets is required under this program.

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications. Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

Under the No Income/No Asset Documentation Program and the No Doc Documentation Program, emphasis is placed on the credit score of the prospective borrower and on the value and adequacy of the mortgaged property as collateral, rather than on the income and the assets of the prospective borrower. Prospective

- 83 -

borrowers are not required to provide information regarding their assets or income under either program, although under the No Income/No Asset Documentation Program, employment is orally verified.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-56.

237.    The Fremont Home Loan Trust 2006-C Prospectus Supplement represented:

There are three documentation types, Full Documentation ("Full Documentation"), Easy Documentation ("Easy Documentation") and Stated Income ("Stated Income"). Fremont's underwriters verify the income of each applicant under various documentation types as follows: under Full Documentation, applicants are generally required to submit verification of stable income for the periods of one to two years preceding the application dependent on credit profile; under Easy Documentation, the borrower is qualified based on verification of adequate cash flow by means of personal or business bank statements; under Stated Income, applicants are qualified based on monthly income as stated on the mortgage application. The income is not verified under the Stated Income program; however, the income stated must be reasonable and customary for the applicant's line of work.

Fremont Home Loan Trust 2006-C Prospectus Supplement at S-40. *See also* Securitized Asset Backed-Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-46.

238.    The Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement stated:

The mortgage loans were originated consistent with and generally conform to the New Century Underwriting Guidelines' full documentation, limited documentation and stated income documentation residential loan programs. Under each of the programs, New Century reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed, and reviews the property.

…

The New Century Underwriting Guidelines require that the income of each applicant for a mortgage loan under the full and limited documentation programs be verified. The specific income documentation required for New Century's various programs is as follows: under the full documentation program, applicants usually are required to submit one written form of verification from the employer

- 84 -

of stable income for at least 12 months for salaried employees and 24 months for self-employed applicants or for any special program applicant with a credit score of less than 580; under the limited documentation program, applicants usually are required to submit verification of stable income for at least 6 months, such as 6 consecutive months of complete personal checking account bank statements. Under the stated income program, an applicant may be qualified based upon monthly income as stated on the mortgage loan application if the applicant meets certain criteria. All the foregoing programs require that, with respect to salaried employees, there be a telephone verification of the applicant's employment.

Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-51-52.

239.    The Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust Prospectus

stated:

Wells Fargo Bank's subprime mortgage loan programs include a full documentation program, a "lite" documentation program and a "stated income, stated asset" program. Under the full documentation program, loans to borrowers who are salaried employees generally must be supported by current employment information in the form of one current pay-stub with year-to-date information and W-2 tax forms for the last year (a complete verification of employment may be substituted for W-2 forms). As an alternative method of establishing income under the full documentation program, Wells Fargo Bank may review the deposit activity reflected in recent monthly bank statements of the applicant. Wells Fargo Bank may also perform a telephone verification of employment for salaried employees prior to funding. Under the full documentation program, borrowers who are self-employed generally must provide signed individual federal tax returns and, if applicable, signed year-to-date income statements and/or business federal tax returns.

…

Under Wells Fargo Bank's "stated income, stated asset" program, the applicant's employment, income sources and assets must be stated on the initial signed application. The applicant's income as stated must be reasonable for the applicant's occupation as determined in the discretion of the loan underwriter; however, such income is not independently verified. Similarly, the applicant's assets as stated must be reasonable for the applicant's occupation as determined in the discretion of the loan underwriter; however, such assets are not independently verified. Maximum loan-to-value ratios within each credit level are lower under the stated income, stated asset program than under the full documentation program.

Under Wells Fargo Bank's "lite" documentation program, the applicant's income must be stated on the initial signed application. The applicant's income as stated

- 85 -

must be reasonable and consistent for the applicant's occupation and reflect an overall ability of the applicant to repay all its debt as determined in the discretion of the loan underwriter. Income is calculated using the most recent and consecutive six-month average of personal bank statements. Maximum loan-to-value ratios within each credit level are lower under the lite documentation program than under the full documentation program.

Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust Prospectus, Dec. 18, 2006, at 43-44. *See also* Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust Prospectus, Mar. 23, 2007, at 47-48.

240.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines.

### C.    Untrue Statements Concerning Loan-to-Value Ratios and DTI Ratios

241.    The Offering Documents provided statistical descriptions of the collateral, such as LTV ratios, combined LTV ratios, and DTI ratios.  *See*, *e.g.*, BCAP LLC Trust 2007-AA1 Prospectus Supplement, at Schedule A.

242.    The Offering Documents represented that independent and objective appraisals were obtained for the properties.  *See*, *e.g.*, BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-56 ("To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession Appraisal Practice.").

243.    The BCAP LLC Trust 2007-AA2 Prospectus Supplement stated:

4226143.1

Countrywide Home Loan's Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 75% for mortgage loans with original principal balances of up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000.

For cash-out refinance mortgage loans, Countrywide Home Loan's Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 75% and original principal balances ranging up to $650,000. The maximum "cash-out" amount permitted is $200,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan. As used in this prospectus supplement, a refinance mortgage loan is classified as a cash-out refinance mortgage loan by Countrywide Home Loans if the borrower retains an amount greater than the lesser of 2% of the entire amount of the proceeds from the refinancing of the existing loan or $2,000.

Countrywide Home Loan's Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 80% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loan's Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loan's Standard Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 75% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

BCAP LLC Trust 2007-AA2 Prospectus Supplement at S-68-69. *See also* BCAP LLC Trust

2007-AA3 Prospectus Supplement at S-69-70.

244.    The BCAP LLC Trust 2007-AA2 Prospectus Supplement continued:

Countrywide Home Loan's Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances of up to $650,000, up to 80% for mortgage loans with original principal balances of up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000 and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loan's Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to 100% for purchase money mortgage loans with original principal balances of up to $375,000.

For cash-out refinance mortgage loans, Countrywide Home Loan's Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 90% and original principal balances ranging up to $1,500,000. The maximum "cash-out" amount permitted is $400,000 and is based in part on the original Loan-to-Value Ratio of the related mortgage loan.

Countrywide Home Loan's Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on owner occupied properties of up to 100% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii). On second homes, Countrywide Home Loan's Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination of up to 95% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii). Countrywide Home Loan's Expanded Underwriting Guidelines for conforming balance mortgage loans generally allow Loan-to-Value Ratios at origination on investment properties of up to 90% on 1 unit properties with principal balances up to $417,000 ($625,500 in Alaska and Hawaii) and 2 unit properties with principal balances up to $533,850 ($800,775 in Alaska and Hawaii) and up to 85% on 3 unit properties with principal balances of up to $645,300 ($967,950 in Alaska and Hawaii) and 4 unit properties with principal balances of up to $801,950 ($1,202,925 in Alaska and Hawaii).

BCAP LLC Trust 2007-AA2 Prospectus Supplement at S-69-70. *See also* BCAP LLC Trust 2007-AA3 Prospectus Supplement at S-71.

245.   The BCAP LLC Trust 2007-AA1 Prospectus Supplement stated:

- 88 -

4226143.1

Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments, and the age of any bankruptcy or foreclosure actions. Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

BCAP LLC Trust 2007-AA1 Prospectus Supplement at S-56.

246.    The Fremont Home Loan Trust 2006-C Prospectus Supplement represented:

"A." Under the "A" category, an applicant must have not more than one 30-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 100% with a minimum Credit Score of 600. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"A-." Under the "A-" category, an applicant must have not more than three 30-day late mortgage payments within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a minimum Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"B." Under the "B" category, an applicant must have not more than one 60-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum loan-to-value ratio is 90% with a Credit Score of 550. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C." Under the "C" category, an applicant must have not more than one 90-day late mortgage payment within the last 12 months and it must be at least 24 months since discharge of any Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 85% with a minimum Credit Score

4226143.1

of 580. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"C-." Under the "C-" category, an applicant must not be more than 150 days delinquent with respect to its current mortgage payment and it must not be subject of a Chapter 7 or Chapter 13 bankruptcy and/or foreclosure. The maximum permitted loan-to-value ratio is 70% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced for: reduced income documentation, non-owner occupied properties, properties with 3-4 units, or properties with rural characteristics.

"D." Under the "D" category, an applicant must not be more than 180 days delinquent with respect to its current mortgage payment. Any Chapter 7 or Chapter 13 bankruptcy proceedings and/or foreclosure actions must be paid in connection with closing. The maximum permitted loan-to-value ratio is 65% with a minimum Credit Score of 500. The maximum permitted loan-to-value ratio is reduced to 60% if the property is currently subject to foreclosure proceedings.

Fremont Home Loan Trust 2006-C Prospectus Supplement at S-42-43. *See also* Securitized Asset Backed-Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-48-49.

247.    The Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement stated:

The New Century Underwriting Guidelines generally permit loans on one to four family residential properties to have a loan-to-value ratio at origination of up to 95% with respect to first liens loans. The maximum loan-to-value ratio depends on, among other things, the purpose of the mortgage loan, a borrower's credit history, home ownership history, mortgage payment history or rental payment history, repayment ability and debt service-to-income ratio, as well as the type and use of the property.

Securitized Asset Backed Receivables LLC Trust 2006-HE2 Prospectus Supplement at S-51.

248.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the collateral and creditworthiness of the borrowers.  The preceding statements were untrue at the time they were made because the LTV ratios were higher than represented and the DTI ratios were higher than represented.

## IX.   THE CLAIMS ARE TIMELY

249.   For actions brought by the NCUA Board as Liquidating Agent, the FCUA extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

250.   The NCUA Board placed the Credit Unions into conservatorship on September 24, 2010.  On October 31, 2010, the NCUA Board placed the Credit Unions into liquidation and appointed itself as Liquidating Agent.

251.   Actions brought under Section 13 of the Illinois Blue Sky Law must be brought within:

> 3 years from the date of sale; provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of subsection E, F, G, H, I or J of Section 12 of this Act which is the basis for the action, the 3 year period provided shall begin to run upon the earlier of:
>
> (1) the date upon which the party bringing the action has actual knowledge of the alleged violation of this Act; or
>
> (2) the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable.

815 Ill. Comp. Stat. Ann. 5/13(D).

252.   Actions brought under Section 581-33 of the Texas Blue Sky Law must be brought no "(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale."  Tex. Rev. Civ. Stat. Ann. art. 581, § 33(H)(2).

253.   As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated

on dimensions that were less readily apparent to investors." Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

254.   The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.   The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security

FSOC Risk Retention Report at 9 (footnote omitted).

255.   The earliest purchase date/offering date with respect to the claims asserted herein was August 25, 2006, or not more than five years prior to September 24, 2010.   Accordingly, the NCUA Board's state law claims are not time-barred.

## X.   CLAIMS FOR RELIEF

### COUNT ONE
**Violation of the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33 (BCAPB LLC Trust 2007-AB1, BCAP LLC Trust 2007-AA1, BCAP LLC Trust 2007-AA2, BCAP LLC Trust 2007-AA3, Fremont Home Loan Trust 2006-C, Securitized Asset Backed Receivables LLC Trust 2006-HE2, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust)**

256.   The NCUA Board realleges paragraphs 1 through 255 of this Complaint, as though fully set forth here, except those paragraphs specific to certificates other than the BCAPB LLC Trust 2007-AB1, BCAP LLC Trust 2007-AA1, BCAP LLC Trust 2007-AA2, BCAP LLC

4226143.1

Trust 2007-AA3, Fremont Home Loan Trust 2006-C, Securitized Asset Backed Receivables LLC Trust 2006-HE2, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and the Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust certificates.

257.    The NCUA Board brings this cause of action pursuant to Section 33 of the Texas Securities Act, with respect to Southwest's purchases of the BCAPB LLC Trust 2007-AB1, BCAP LLC Trust 2007-AA1, BCAP LLC Trust 2007-AA2, BCAP LLC Trust 2007-AA3, Fremont Home Loan Trust 2006-C, Securitized Asset Backed Receivables LLC Trust 2006-HE2, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and the Wells Fargo Home Equity Asset-Backed Securities 2007-1 Trust certificates against Defendant Barclays, as the seller of those certificates.

258.    Defendant Barclays offered to sell and sold the securities to Southwest by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

259.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

260.    Defendant Barclays sold the certificates to Southwest in Texas.

261.    At the time Southwest purchased the certificates, it did not know of these untruths and omissions.

262.    If Southwest had known about these untruths and omissions, it would not have purchased the securities from Defendant Barclays.

263.    Defendant Barclays's sales of the certificates violated Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

264.    Southwest and Plaintiff sustained damages as a result of Defendant Barclays's violations of Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

265.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Barclays, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### COUNT TWO
**Violation of the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Ann. 5/12
(BCAPB LLC Trust 2007-AB1, BCAP LLC 2007-AA2, BCAP LLC Trust 2007-AA3, Wells
Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and Wells Fargo Home Equity
Asset-Backed Securities 2007-1 Trust)**

266.    The NCUA Board realleges paragraphs 1 through 255 of this Complaint, as though fully set forth here, except those paragraphs specific to certificates other than the BCAPB LLC Trust 2007-AB1, BCAP LLC 2007-AA2, BCAP LLC Trust 2007-AA3, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and the Wells Fargo Home Equity Asset-Backed Securities 2007-1 certificates.

267.    The NCUA Board brings this cause of action pursuant to Section 12 of the Illinois Securities Law of 1953, with respect to Members United's purchases of the BCAPB LLC Trust 2007-AB1, BCAP LLC 2007-AA2, BCAP LLC Trust 2007-AA3, Wells Fargo Home Equity Asset-Backed Securities 2006-3 Trust, and Wells Fargo Home Equity Asset-Backed Securities 2007-1 certificates against Defendant Barclays, as the seller of those certificates.

268.    Defendant Barclays offered to sell and sold the securities to Members United by means of written and/or oral communications which included untrue statements of material fact

4226143.1

and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

269.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

270.    Defendant Barclays sold the certificates to Members United in Illinois.

271.    At the time Members United purchased the certificates, it did not know of these untruths and omissions.

272.    If Members United had known about these untruths and omissions, it would not have purchased the securities from Defendant Barclays.

273.    Defendant Barclays's sales of the certificates violated 815 Ill. Comp. Stat. Ann. 5/12(G).

274.    Members United and Plaintiff sustained damages as a result of Defendant Barclays's violations of 815 Ill. Comp. Stat. Ann. 5/12(G).

275.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant Barclays, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## Jury Demand

Plaintiff hereby demands a trial by jury of all issues properly triable.

4226143.1

Dated:  September 23, 2013

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751

Stephen M. Tillery
Peter H. Rachman
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

Mark C. Hansen
David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
        EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of Southwest Corporate
Federal Credit Union and Members United
Corporate Federal Credit Union

By:  _____
        Shawn P. Naunton (SN-0397)

Shawn P. Naunton
ZUCKERMAN SPAEDER LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Phone: (212) 704-9600
Fax: (212) 704-4256

Graeme W. Bush
Andrew N. Goldfarb
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Phone: (202) 778-1800
Fax: (202) 822-8106

Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
        ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314

*Attorneys for the National Credit Union Administration Board*

4226143.1